# United States Court of Appeals for the Federal Circuit

2008-1188


CONNER BROS. CONSTRUCTION COMPANY, INC.,

Appellant,

v.


Pete Geren, SECRETARY OF THE ARMY,

Appellee.


Joseph C. Staak, Smith, Currie & Hancock LLP, of Atlanta, Georgia, argued for appellant.

Lauren S. Moore, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With her on the brief were Gregory G. Katsas, Assistant Attorney General, Jeanne E. Davidson, Director, and Donald E. Kinner, Assistant Director. Of counsel on the brief was Henry R. Richmond, Deputy District Counsel, United States Army Corps of Engineers, of Savannah, Georgia.

Appealed from: Armed Services Board of Contract Appeals

Administrative Judge Alexander Younger

# United States Court of Appeals for the Federal Circuit

2008-1188

CONNER BROS. CONSTRUCTION COMPANY, INC.,

Appellant,

v.

Pete Geren, SECRETARY OF THE ARMY,

Appellee.

Appeal from the Armed Services Board of Contract Appeals
in no. 54109, Administrative Judge Alexander Younger.

_____

DECIDED:  December 31, 2008
_____

Before BRYSON, GAJARSA, and DYK, <u>Circuit Judges</u>.

BRYSON, <u>Circuit Judge</u>.

Conner Bros. Construction Company, Inc., a construction contractor doing work for the Army Corps of Engineers, sought delay damages after it was denied access to its construction site on a military base for 41 days following the terrorist attacks of September 11, 2001.  The Armed Services Board of Contract Appeals denied Conner's claim on the ground that the sovereign acts doctrine shielded the Army from liability. We agree with the Board that the order excluding Conner from the base was a sovereign act that precludes recovery of damages for the delay that resulted from that act.

I

On April 21, 2000, Conner contracted with the Corps of Engineers to construct an Army Ranger regimental headquarters facility within the 75th Ranger regimental compound at Fort Benning, Georgia. The Ranger compound is a segregated area within Fort Benning that is under the operational control of the Ranger regimental commander. The contract, which was for the construction of four buildings at two sites within the compound, was administered by a Corps of Engineers project manager.

In response to the terrorist attacks against the United States on September 11, 2001, Fort Benning was placed at force protection condition Delta and shut down to everyone except essential personnel. General (then Colonel) Joseph Votel, the commander of the 75th Ranger regiment, also restricted access to the Ranger compound to mission-essential personnel and ordered his staff to direct Conner to stop work and vacate the compound immediately. Conner's workforce left the compound by 2:00 p.m. on September 11, 2001, at which point its contract work was roughly 70-75% complete. On September 17, 2001, Fort Benning lowered its force protection condition, allowing contractors and other personnel to return to the base. However, the Ranger compound continued to operate under condition Delta and remained subject to General Votel's order restricting access to mission-essential personnel, and Conner continued to be excluded from its worksites within the compound.

In the immediate aftermath of the terrorist attacks, the Rangers prepared for deployment to Afghanistan. They executed a "protracted low-level deployment" whereby they departed in small groups so that their movements would not attract notice. During that period, the Rangers occupied one of the partially constructed buildings on

Conner's worksite. General Votel testified that he decided to shut down Conner's construction activities in order to maintain operational security by preventing information leaks while the Rangers prepared to deploy. He explained that because Conner's work was the "biggest thing happening on the installation," Conner's activities put its employees and subcontractors in a unique position to observe sensitive deployment activities.

Conner was excluded from the compound until September 27, 2001, when it was allowed to return to one of its worksites. It was permitted access to its other site on October 15, 2001, and it resumed work there on October 21, 2001. Conner subsequently sought additional time to complete the project and $137,744 in delay damages attributable to 35 of the 41 days during which it was shut down—that is, for the period between September 17, 2001, when other contractors were permitted back on the compound, and October 21, 2001, when Conner returned to work. The contracting officer granted Conner the requested additional time to complete the project but denied the monetary claim. Conner appealed that decision to the Board.

After conducting a three-day hearing, the Board denied Conner's appeal. As an affirmative defense, the Corps of Engineers asserted that the exclusion of Conner from the construction site constituted a sovereign act that precluded Conner from recovering damages for the delay. Conner argued that it was the sole target of the shutdown order, as it was the only contractor ordered to leave the compound. For that reason, Conner argued, the shutdown order was not a "public and general" act, and the government therefore could not invoke the "sovereign acts doctrine" as a defense to liability for breach of contract. The Board, however, found that the exclusion order was

a sovereign act because it stemmed from the government's war-making powers, was merely incidental to the accomplishment of a broader governmental objective relating to national security, and was not directed principally at Conner's contract rights. The Board also rejected Conner's arguments that it was entitled to relief under the contract's "Changes" and "Suspension of Work" clauses. Conner now appeals to this court.

II

The sovereign acts doctrine provides that "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." Horowitz v. United States, 267 U.S. 458, 461 (1925). The doctrine is an affirmative defense that is an inherent part of every government contract. Hughes Commc'ns Galaxy, Inc. v. United States, 998 F.2d 953, 958 (Fed. Cir. 1993). It is based on the government's dual roles as contractor and sovereign, and it is designed to balance "the Government's need for freedom to legislate with its obligation to honor its contracts." United States v. Winstar Corp., 518 U.S. 839, 896 (1996) (principal opinion of Souter, J.).

The doctrine is rooted in three early Court of Claims cases. In Deming v. United States, 1 Ct. Cl. 190 (1865), a supplier who had contracted to provide rations to the Marine Corps sued for damages when the enactment of the Legal Tender Act resulted in the imposition of additional duties on some articles making up the rations, thereby raising the contractor's costs. The Court of Claims explained that "[a] contract between the government and a private party cannot be specially affected by the enactment of a general law" and held that the imposition of the duty constituted a sovereign act that did not form the basis for governmental liability for breach of contract. Id. at 191 (emphasis

in original).  In what has become the iconic statement of the sovereign acts doctrine, the court wrote: "The United States as a contractor are not responsible for the United States as a lawgiver."  Id.

In Jones v. United States, 1 Ct. Cl. 383 (1865), the Court of Claims extended the rule of Deming from legislative to executive acts.  The court rejected a suit brought by surveyors working for the Commissioner of Indian Affairs when their performance was hindered by the withdrawal of U.S. troops from Indian territories.  As in Deming, the court emphasized that "the United States as a contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign."  Id. at 385.

Finally, in Wilson v. United States, 11 Ct. Cl. 513 (1875), the plaintiff contracted to deliver mules to the Quartermaster-General during the Civil War.  When the plaintiff attempted to deliver the mules in Washington, D.C., which was in danger of capture by Confederate forces, the contractor was refused entry to the city under orders from the military governor of Washington barring any person not in the military service from entering the city without signed permission from a commanding general.  After the plaintiff was turned away, Confederate soldiers confiscated some of the plaintiff's mules.  The plaintiff then sued the United States to obtain compensation for the loss.  Reaffirming the principles of Deming and Jones, the court invoked the sovereign acts doctrine to hold the government free from liability.  The court explained that the exclusion order "was general, applying to all persons, and affecting the claimant precisely as though he had contracted with any private corporation."  Id. at 521.

The Supreme Court addressed the sovereign acts doctrine for the first time in Horowitz v. United States, 267 U.S. 458 (1925).  In that case, the Court explicitly

approved the formulation of the doctrine in the early Court of Claims cases.  The plaintiff in Horowitz contracted with the Ordnance Department to purchase silk, which he intended to resell at a profit.  Although the government had agreed to ship the merchandise within a specified period, its delivery was delayed when the U.S. Railroad Administration embargoed freight shipments of silk.  By the time Horowitz received the silk, the price of silk had fallen and Horowitz was forced to sell his silk at a loss.  Finding that the embargo was a public and general act, the Court denied Horowitz's claim to recover damages for the delay.  Horowitz, 267 U.S. at 461.  The Court explained:

> The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other.  Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons.

Id., quoting Jones, 1 Ct. Cl. at 384.

In addition to requiring that the governmental act be "public and general," the Court in Horowitz explained that private contractors who deal with the United States should not be treated any more favorably than if they had contracted with a private party.  Thus, just as private contractors would not recover in the event of an intervening sovereign act that disrupted contract expectations, the Court stated that the same principle would apply to those contracting with the government.  The Court wrote:

> In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.

Id.; see also Jones, 1 Ct. Cl. at 385 ("If the removal of troops from a district liable to invasion will give the claimant damages for unforeseen expenses, when the other party is a corporate body, then it will when the United States form the other party, but not otherwise."); Richard E. Speidel, Implied Duties of Cooperation and the Defense of Sovereign Acts in Government Contracts, 51 Geo. L.J. 516, 539 (1963) (noting policy that "a contractor who deals with the United States in its contractual capacity should occupy no better risk position than if he were dealing with a private party").

In United States v. Winstar Corp., 518 U.S. 839 (1996), the Supreme Court was again presented with a case requiring it to address the meaning of a "public and general act" for purposes of the sovereign acts doctrine. The issue in Winstar was whether the government was liable for breach of contract resulting from Congress's enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). Prior to the Act, the Federal Home Loan Bank Board had induced healthy financial institutions to take over insolvent thrifts by promising favorable accounting treatment for the acquired assets. Subsequently, however, Congress enacted FIRREA, which eliminated those accounting benefits. The Supreme Court held that the legislative elimination of the agreed-upon benefits constituted a breach by the United States of its contractual obligations to the acquiring institutions for which the government was liable.

The Court in Winstar rejected the government's argument that the legislation constituted a sovereign act that provided a defense against claims of contract breach. The principal opinion, authored by Justice Souter, explained that in order to place the government on an equal footing with other contractors, "some line has to be drawn" between situations in which the government's act is "relatively free of Government self-

interest," and those in which the action is "tainted by a governmental object of self-relief." Winstar, 518 U.S. at 896. The government will not be held liable, Justice Souter explained, "so long as the action's impact upon public contracts is, as in Horowitz, merely incidental to the accomplishment of a broader governmental objective." Id. at 898. In contrast, the sovereign acts defense is unavailable "where a substantial part of the impact of the Government's action rendering performance impossible falls on its own contractual obligations." Id. The principal opinion concluded that FIRREA was not a public and general act because "[t]he statute not only had the purpose of eliminating the very accounting gimmicks that acquiring thrifts had been promised, but the specific object of abrogating enough of the acquisition contracts as to make that consequence of the legislation a focal point of the congressional debate." Id. at 900.

Although the portion of the principal opinion addressed to the sovereign acts doctrine had the support of only four (and as to some portions, only three) justices, this court has treated that opinion as setting forth the core principles underlying the sovereign acts doctrine. See Carabetta Enters., Inc. v. United States, 482 F.3d 1360, 1365 (Fed. Cir. 2007); Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1574-77 (Fed. Cir. 1997). That approach probably best approximates the Supreme Court's position with respect to the doctrine. The dissenting justices in Winstar would have given the doctrine broader sweep. Winstar, 518 U.S. at 933 (Rehnquist, C.J., dissenting) (a general regulatory action constitutes a "sovereign act" regardless of whether the action was "free of governmental self-interest" or was "tainted" by a governmental objective of "self-relief"). The concurring justices would have construed the doctrine more narrowly, but still would regard it, along with the "unmistakability

doctrine," as reversing the normal presumption that a party will be liable for any impossibility that is attributable to its own actions. Winstar, 518 U.S. at 920-21, 923-24 (Scalia, J., concurring in the judgment). In any event, we discern no indication in the separate opinions in Winstar that the approach taken by the justices who subscribed to those opinions would lead to a different result on the facts of this case than the result reached by the Board.

In cases following Winstar, we have reiterated that the sovereign acts defense is unavailable where the governmental action is specifically directed at nullifying contract rights. See, e.g., City Line Joint Venture v. United States, 503 F.3d 1319, 1323 (Fed. Cir. 2007) (legislation abrogating option of low-income apartment owners to prepay mortgages was not a sovereign act because it was "aimed at the contract rights themselves in order to nullify them," quoting Cienega Gardens v. United States, 331 F.3d 1319, 1335 (Fed. Cir. 2003)); Centex Corp. v. United States, 395 F.3d 1283, 1308 (Fed. Cir. 2005) (legislation breaching agreements entitling financial institutions to take tax deductions for specific losses was not a public and general act because it "was specifically targeted at appropriating the benefits of a government contract"). Even before Winstar, our precedent provided that the government could not use the sovereign acts defense as a means to escape from contracts that it subsequently concluded were unwise. See Everett Plywood Corp. v. United States, 651 F.2d 723, 731-32 (Ct. Cl. 1981).

In addition, when considering whether the alleged sovereign act is exclusively directed to aborting performance of government contracts, courts addressing the sovereign acts doctrine have looked to the extent to which the governmental action was

directed to relieving the government of its contractual obligations. As Justice Souter stated in Winstar, "The greater the Government's self-interest, . . . the more suspect becomes the claim that its private contracting partners ought to bear the financial burden of the Government's own improvidence . . . ." Winstar, 518 U.S. at 898 (principal opinion of Souter, J.). The Court of Federal Claims applied that principle in Casitas Municipal Water District v. United States, 72 Fed. Cl. 746 (2006), aff'd in part, 543 F.3d 1276 (Fed. Cir. 2008). In that case, the United States agreed to construct and operate a water reclamation project in exchange for a commitment from the Casitas Municipal Water District to repay the construction and operation costs. Almost 40 years after construction of the project, the National Marine Fisheries Service listed the West Coast Steelhead Trout as an endangered species and subsequently issued a biological opinion pursuant to the Endangered Species Act requiring Casitas to construct a fish passage facility and adhere to new operating criteria to assist trout migration. When the water district sued the government for breach of contract, the court held that the biological opinion was a sovereign act because "no economic advantage accrued to the United States, as a contracting party, as a result of" its issuance. 72 Fed. Cl. at 755.

Another factor relevant to the "public and general" inquiry is whether the governmental action applies exclusively to the contractor or more broadly to include other parties not in a contractual relationship with the government. In the Yankee Atomic case, an electric utility that purchased uranium enrichment services from the government brought suit to recover costs it incurred pursuant to the Energy Policy Act of 1992, which required domestic utilities to pay a pro rata share of costs associated with decontaminating and decommissioning former enrichment facilities. In concluding that

the legislation constituted a sovereign act, we emphasized that "the special assessment does not reach only those utility companies that previously contracted with the Government; it also reaches those utilities that purchased the services through the secondary market but had no contracts with the Government." 112 F.3d at 1576 (emphasis in original). Thus, any governmental act that obstructs a government contract is more likely to be regarded as incidental when the scope of the governmental act is sufficiently broad to affect parties having no connection to the contract.

In light of these principles, we sustain the Board's decision that the exclusion order that temporarily shut down Conner's performance was a sovereign act and that the government is therefore not liable for delay damages under its contract with Conner. As we explain in detail below, the exclusion order was not directed at relieving the government of its contractual obligations; to the contrary, any effect on Conner was incidental to a broader governmental objective relating to national security.

III

Conner's primary contention on appeal is that General Votel's exclusion order cannot be a public and general act, because the order was specifically directed at Conner's performance of its contract. This argument is predicated on Conner's assertion that General Votel issued two separate directives: one restricting the Ranger compound to mission-essential personnel, and the other specifically excluding Conner from the compound. In fact, however, the two orders are not as segregable as Conner suggests. Instead, the decision to exclude Conner was simply an extension of the broader access restrictions implemented to respond to the emergency created by the terrorist attacks.

The Board found, and Conner does not dispute, that the restriction of the Ranger compound to mission-essential personnel and the refusal to admit Conner both served the same governmental objective: maintaining operational security as the Rangers prepared to deploy after the attacks of September 11, 2001. General Votel and his deputy commander testified to their concern that Conner's operation was a large-scale project, that Conner's workers were constantly moving about the compound, and that the workers were well positioned to observe Ranger staging activities. The Rangers also needed one of the partially completed facilities to prepare for their post-September 11 mission. Based on the evidence before it, the Board found that Conner was barred from returning to the compound because of General Votel's determination that Conner's activities on the compound presented risks and impediments to the accomplishment of an important policy objective that was unrelated to the parties' obligations under the contract. The Board therefore concluded that Conner's exclusion from the compound was not directed at the contract, but was just a specific application of the general exclusion order.

Conner contends that General Votel's order was targeted at Conner's contract rights precisely because his order was predicated on concerns about Conner's presence in the compound. In so arguing, Conner seemingly takes issue with the Board's finding that in attempting to secure the Ranger compound and provide a facility for the Rangers to prepare for deployment, General Votel had to make particularized judgments as to which activities potentially interfered with that objective. Contrary to Conner's suggestion, the fact that the government made case-specific determinations as to who was nonessential and whose presence interfered with the Rangers'

operations in the compound does not convert an otherwise public and general act into a nongeneral one. Nor does the fact that General Votel specifically instructed his subordinates to order Conner to vacate the compound on September 11, 2001, bolster Conner's assertion that its exclusion constituted an action distinct from the general exclusion order.

Conner next makes the related claim that because it was the only contractor barred from returning to work on the compound, while certain other contractors were granted access, the exclusion order must necessarily be regarded as directed at Conner's contract rights. That argument suffers from several flaws. To begin with, the exclusion order was not limited to Conner's activities. The Board found that under the access restrictions, "ordinary civilians, journalists, Department of the Army civilians, and contractors not concerned with the Rangers would have been denied access to the compound." Thus, by analogy to Yankee Atomic, the access restrictions reached not only parties having contracts with the government, but also parties with no government contracts at all, including the public at large. See Yankee Atomic, 112 F.3d at 1576.

More generally, the public and general nature of an action does not turn on the number of contracts it actually obstructed. While the legislation at issue in Winstar affected financial institutions generally, that did not prevent the Supreme Court from rejecting the sovereign acts defense, because the legislation specifically discharged the government's contractual obligations to the institutions that had agreed to acquire failing thrifts. Conversely, governmental actions affecting a single contractor can be shielded by the sovereign acts doctrine as long as the effect on the contractor's contract rights is incidental to a broader governmental objective. For example, in Casitas Municipal

<u>Water District v. United States</u>, 543 F.3d 1276, 1288 (Fed. Cir. 2008), we affirmed the application of the sovereign acts doctrine where a municipal water district was specifically ordered to construct a fish passage facility and take other steps to protect an endangered trout species. And in <u>Orlando Helicopter Airways, Inc. v. Widnall</u>, 51 F.3d 258, 262 (Fed. Cir. 1995), we upheld as a sovereign act a stop-work order issued by a contracting officer after the Department of Justice had launched a criminal investigation into alleged fraud by the contractor. The sovereign acts inquiry does not rest on a mechanical determination of how many contractors are affected, but rather focuses on the nature and scope of the governmental action.

The Board correctly concluded that this case is a far cry from the "change of heart" cases in which the government unilaterally terminated a single contract after deciding that performance would be unwise. See <u>Everett Plywood Corp. v. United States</u>, 651 F.2d 723, 731-32 (Ct. Cl. 1981) (rejecting sovereign acts defense where National Forest Service terminated a timber contract because of anticipated environmental damage); <u>Sun Oil Co. v. United States</u>, 572 F.2d 786, 817 (Ct. Cl. 1978) (rejecting sovereign acts defense where plaintiffs who obtained oil and gas leases from the Department of Interior were denied permits to install drilling platforms). The Army did not exclude Conner from the worksite because it was unhappy with Conner's performance, or because it was unhappy with the contract price, or because it decided that it no longer wanted a new Ranger headquarters facility. Rather, General Votel made a determination that excluding Conner directly served the government's broader objective of restricting access to the compound in order to minimize potential threats to operational security and to facilitate deployment. The fact that Conner's activities were

conducted pursuant to a government contract does not mean that General Votel's decision that Conner was not a mission-essential contractor was directed at Conner's right to perform its contract to construct the Ranger headquarters.

The fact that other contractors were permitted back onto the Ranger compound after September 17, 2001, also does not support Conner's contention that its exclusion resulted from a governmental act aimed at its contract rights. The Board noted that dining facility and custodial services contractors, a Coca-Cola vendor, and cable television personnel were all allowed on the compound while Conner was denied access. The Board found, however, that although Conner was "treated differently from non-construction contractors," those other contractors were not situated similarly to Conner. See Gothwaite v. United States, 102 Ct. Cl. 400, 401 (1944). Unlike Conner, both the dining facility and custodial contractors were deemed to be mission-essential. The Board found that the Rangers could not leave the compound for food, and that the custodial workers were essential to ensure proper sanitation on the facility. In addition, the admission of "mission-essential" personnel contemplated the admission of persons who would not interfere with mission planning or security. The Board noted that, unlike Conner's workers, the food service and custodial contract employees were either confined to limited areas within the compound or could be admitted with escorts, thereby minimizing any potential operational disruptions or security breaches.

The government acknowledges that the Coca-Cola vendor and the cable personnel who were admitted to the compound were not mission-essential. General Votel admitted that their presence in the compound during the restricted access period was inappropriate; in fact, he explained, their presence contravened his orders. But the

Board found that the Coca-Cola and cable personnel, like the dining and custodial contractors, were "qualitatively different" from Conner. Conner and its subcontractors constituted a massive presence on the compound, moved around extensively, could view the areas of the compound where the Rangers were preparing to deploy, and could not feasibly be escorted. In that regard, the Coca-Cola and cable television personnel were not situated similarly to Conner. Moreover, and more importantly, the admission of the Coca-Cola and cable television personnel was a mistake, in that it violated General Votel's exclusion order. The fact that his order was disobeyed in those instances does not affect the general nature of the exclusion order or show that the government's action targeted Conner's contract rights. Based on the Board's factual findings we sustain the Board's legal conclusion that the admission of non-construction contractors in the period following September 17, 2001, did not bar the application of the sovereign acts defense.

The Board's conclusion that General Votel's exclusion order was not directed at Conner's contract rights is further supported by the fact that the government gained no economic advantage by refusing to admit Conner to the Ranger compound. See Casitas, 72 Fed. Cl. at 755. The Corps of Engineers did not seek to shift its costs to Conner, and it granted Conner contract extensions to compensate for the period in which Conner was shut down. Because the government as contractor gained nothing from barring Conner during the exclusion period, the exclusion order cannot be fairly said to have been "tainted by the governmental object of self-relief." See Winstar, 518 U.S. at 896 (principal opinion of Souter. J.). The broad reach of the exclusion order and the absence of governmental self-interest indicate that the order was not specifically

targeted at appropriating the benefits of a government contract and that any effect on Conner's contract rights was merely incidental to the achievement of a broader governmental objective.

Granting Conner delay damages would also undercut one of the principal rationales of the sovereign acts doctrine: that contractors dealing with the government should not receive more favorable treatment than they would if contracting with a private party. If Conner had contracted with a private company to construct a building immediately outside Fort Benning, and the Army had temporarily excluded Conner from its worksite after the attacks of September 11 in order to set up a security perimeter around the base and to facilitate troop deployments, Conner would not have been able to shift the costs resulting from the work stoppage to its private contracting partner (absent a specific clause in the contract so providing). That being so, it would be anomalous to grant Conner monetary damages in a parallel situation in which the only difference is that the government, rather than a private party, was Conner's contracting partner.

In short, General Votel's order excluding Conner from its worksite fits comfortably within the category of actions that we have consistently upheld as sovereign acts. In fact, the circumstances of this case closely parallel those in Wilson, where the government contractor was refused entry into Washington, D.C., during the Civil War pursuant to an exclusion order issued by the city's military governor. Concluding that the contractor's exclusion was a sovereign act, the court in Wilson emphasized that the order was, as here, issued by a military commander rather than a contracting agent and

was "limited strictly to the public defense." Wilson, 11 Ct. Cl. at 521.[1] Like Wilson, Conner suffered losses as a result of the exclusion order. As in Wilson, however, the effect on Conner's contract rights was incidental to the achievement of a broader governmental objective relating to national security and therefore did not give rise to governmental liability.

Conner further contends that even if the exclusion order constituted a public and general act, the government cannot avoid liability because it failed to establish a common-law impossibility defense. As explained in Winstar, even where the sovereign acts doctrine applies, "the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach." Winstar, 518 U.S. at 904 (principal opinion of Souter, J.); see Carabetta, 482 F.3d at 1365. Thus, the nonoccurrence of the act in question must have been a basic assumption of the contract, and the government must not have assumed the risk that such an act would occur. See Winstar, 518 U.S. at 905; Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1294 (Fed. Cir. 2002). Conner argues that the government did in fact contemplate that an emergency could result in a shutdown, and that by expressly promising in the contract that Conner's work would be performed in facilities that would

---

[1]    Conner is correct that the fact that the government may have had lawful authority and valid reasons for taking an action is not sufficient to satisfy the "public and general" requirement. Serving the public good is a necessary but insufficient condition for asserting the sovereign acts defense. See Winstar, 518 U.S. at 903 (principal opinion of Souter, J.) (noting that a purpose of advancing the public welfare cannot "serve as a criterion of a 'public and general' sovereign act"). The key issue here—as in all sovereign act cases—is not whether the government had the authority to exclude Conner for national security purposes, but rather who should bear the cost of an action that was admittedly in the public interest: a single contractor or the taxpayers at large. The answer to that question turns on whether the governmental action was public and general, not whether it served the public interest.

be "unoccupied and vacant" during the course of construction, the government further assumed the risk of any such occurrence, thereby precluding a valid impossibility defense. We need not address the merits of this argument, however, because Conner failed to raise it before the Board.

Conner attempts to avoid the consequences of its waiver of the "impossibility" argument by noting that because the sovereign acts doctrine is an affirmative defense, the government had the burden of establishing each element of the defense, including the "impossibility" component. However, the sovereign acts doctrine was the government's sole defense to Conner's liability claim and the focus of the argument before the Board. In response to the government's assertion of the defense, Conner challenged the public and general nature of the exclusion order, disputed its reasonableness, and questioned General Votel's authority to shut down the construction project. Conner did not, however, suggest that the elements of impossibility were not satisfied. In particular, Conner did not suggest that the shutdown in response to a national emergency was foreseeable or that the government assumed the risk of any such occurrence. Having challenged the government's assertion of the sovereign acts defense before the Board, Conner was obliged to put forth all of its arguments against the application of that defense. Because Conner failed to argue that the government did not satisfy the "impossibility" requirement of the sovereign acts defense, it has waived that argument for purposes of appeal.

IV

As an alternative ground for recovery, Conner contends that the Corps of Engineers breached its implied duty to cooperate by failing to issue a suspension of

work order after General Votel issued the exclusion order. As the Board found, however, the contracting officer played no part in the decision to restrict access to the Ranger compound. That decision was a sovereign act involving national security, and it was unrelated to any interests of the government as contractor. The contracting officer was under no obligation to issue a suspension of work order in response to an action taken by the government in its sovereign capacity. Cf. Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 392-93 (Ct. Cl. 1969) (finding that contracting officer should have issued a suspension of work order where the government, acting in its contractual capacity and for the convenience of the government as contractor, caused a delay in performance). We therefore uphold the Board's decision that Conner is not entitled to recovery under the "suspension of work" clause of the contract, and we affirm the Board's ruling that Conner's exclusion from the worksite qualified as a sovereign act that relieved the government of liability for delay damages.

AFFIRMED.