DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| Chugach Federal Solutions, Inc. | ) | ASBCA Nos. 62712, 62713, 62877 |
| | ) | |
| Under Contract No. FA5000-13-C-0005 | ) | |

APPEARANCES FOR THE APPELLANT:    Douglas L. Patin, Esq.
  Lee-Ann C. Brown, Esq.
  Lisa A. Markman, Esq.
    Bradley Arant Boult Cummings LLP
    Washington, DC

APPEARANCES FOR THE GOVERNMENT:    Caryl A. Potter, III, Esq.
    Deputy General Trial Counsel
  Josephine R. Farinelli, Esq.
    Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE MELNICK

Chugach Federal Solutions (Chugach) was an operations and maintenance contractor at three isolated military facilities. When the COVID-19 pandemic struck, the government required contract employees to quarantine for 14 days before proceeding with performance. Chugach seeks the costs of complying with that requirement. The parties elected to proceed under Board Rule 11, and we decide only entitlement at this time. The government primarily defends based upon the sovereign acts doctrine. We rule the government has failed to carry its burden to establish the sovereign acts defense. Under the contract's terms, Chugach is entitled to an equitable adjustment for the costs arising from the quarantine.

FINDINGS OF FACT

1. On November 30, 2012, the United States Air Force (government) awarded the contract identified above to Chugach (R4, tab 1).[1] Chugach was to provide operations and maintenance services at three remote facilities. They were: Eareckson Air Station, located on the Aleutian Island of Shemya; Wake Island, located in the

---

[1] Through the course of the litigation the government filed multiple versions of the Rule 4 file. By email to the Board dated August 26, 2024, copied to Chugach's counsel, the government represented that a supplemental version filed on that day constituted the agreed upon file for the record. All Rule 4 citations in this decision are to that version of the file.

DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

north Pacific Ocean a few hundred miles west of the International Date Line; and
King Salmon Air Station, approximately 239 miles southwest of Anchorage, Alaska.
(*Id.* at 4-6, tab 2 at 7). All three facilities are under the command of the Pacific
Air Forces Regional Support Center (PRSC). The scope of the services provided was
quite extensive. Most of the contract line items were firm-fixed price, with some cost
reimbursable line items for acquired parts. (R4, tab 1 at 4-744; tab 2 at 7-73; gov't br.
at 3) Chugach subcontracted with Chenega Security Support Solutions (Chenega) to
provide certain security services (app. br. at 2; gov't br. at 4).

2. The contract incorporated by reference FAR 52.243-4, CHANGES
(JUN 2007); 52.249-8, DEFAULT (FIXED-PRICE SUPPLY & SERVICE) (APR 1984);
and 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984) for
identified line items (R4, tab 1 at 895-96). The contract also incorporated via full text
AFFARS 5352.223-9001, HEALTH AND SAFETY ON GOVERNMENT
INSTALLATIONS (JUN 1997) (R4, tab 1 at 933-34). That clause requires the
following:

(a) In performing work under this contract on a Government installation, the
contractor shall:

(1) Comply with the specific health and safety requirements established by
this contract;

(2) Comply with the health and safety rules of the Government installation
that concern related activities not directly addressed in this contract;

(3) Take all reasonable steps and precautions to prevent accidents and
preserve the health and safety of contractor and Government personnel
performing or in any way coming in contact with the performance of this
contract; and

(4) Take such additional immediate precautions as the contracting officer
may reasonably require for health and safety purposes.

(b) The contracting officer may, by written order, direct Air Force Occupational
Safety and Health Standards (AFOSH) and/or health/safety standards as
may be required in the performance of this contract and any adjustments
resulting from such direction will be in accordance with the Changes clause
of this contract.

(c) Any violation of these health and safety rules and requirements, unless
promptly corrected as directed by the contracting officer, shall be grounds

2

DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

for termination of this contract in accordance with the Default clause of this contract.

(*Id.*)

3. We take judicial notice that on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.

4. On March 18, 2020, the contracting officer emailed Chugach with a direction to implement guidance from Colonel Paul Cornwell, commander of PRSC. The email also notified Chugach that further guidance would be issued. The email quoted AFFARS 5352.223-9001 in its entirety. It asked that as further policy and guidance was issued Chugach remain in touch with the contracting officer to work through it together. It closed by stating:

> If any required actions result in an increase or decrease in the cost of, or time required for, performance of any part of work under this contract, [Chugach] must assert its right to equitable adjustment within 30 days from receipt of the order. However, if a longer time can be justified, I may receive and act upon the proposal as long as it is before final payment of the contract.

(R4, tab 29 at 1) The instructions forwarded from Colonel Cornwell, addressed to "Mission partners," discussed COVID-19. He warned that restrictive measures were in a state of flux. He explained that the PRSC was following Department of Defense, Air Force, and Centers for Disease Control and Prevention guidance. He noted that, due to the remoteness of PRSC's facilities, it was important for leaders to engage with high-risk employees and consider rotating them to areas with greater levels of medical support. He stressed that leaders should assume it was not a matter of if, but when COVID-19 would infect the sites. He stated that at this time he was not placing further restrictions on airfields. But he ordered personnel to take steps to limit interaction and take precautions. He noted that COVID-19 would be with them for quite some time, the effect would increase, and the guidance would change. (R4, tab 29 at 3-5)

5. By email dated March 23, 2020, the contracting officer once again issued directions to Chugach under AFFARS 5352.223-9001. He ordered it to coordinate with unions and personnel, including subcontractors, to reduce the number of new personnel introduced into installation populations. He also required Chugach to adhere to federal and state travel restrictions, especially regarding self-isolation and/or quarantine timelines. He also referred to screening policies that would be implemented for flights to PRSC installations. (R4, tab 31)

DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

6.  On April 2, 2020, Colonel Cornwell issued a memorandum (a copy of which was forwarded to the contracting officer) to all personnel entering PRSC installations, including Chugach, directing, effective April 3, that, "prior to entering a PRSC installation, all PRSC personnel (military and civilians), . . . and contractors, transiting to a PRSC installation shall abide by self-quarantine requirements set forth by installation commanders en route, and comply with applicable state and local health mandates" (R4, tabs 41-41a).  On April 6, 2020, the program manager emailed Chugach (copying the contracting officer) that the intent of Colonel Cornwell's self-quarantine policy was to require Chugach employees desiring to travel to Wake Island, King Salmon Air Station, or Eareckson Air Station to quarantine for a minimum of 14 days (R4, tab 42).  On April 10, 2020, Colonel Cornwell issued a revision to his prior memorandum (a copy of which was forwarded to the contracting officer) clarifying to all personnel entering PRSC installations, including Chugach, that personnel traveling to PRSC installations in Alaska shall abide by a 14-day self-quarantine in Alaska prior to traveling to the installation.  Personnel traveling to Wake Island should self-quarantine in their residence prior to traveling through Hawaii.  (R4, tabs 49-49a)

7.  The government contends the goal of the quarantine was to prevent "COVID-19 from spreading to a remote and isolated location with a critical mission, extremely limited means to quarantine infected personnel once on the island, no ICU beds or emergency medical capabilities in the event that infected personnel showed life-threatening symptoms, and no guarantee of sufficient medical evacuation for symptomatic personnel due to distance and unpredictable severe weather conditions" (gov't br. at 3).  It concedes, and we find, that the quarantine directives served to protect the health and safety of all personnel on site (gov't br. at 12).  This includes contractors participating in the critical mission.  By invoking and quoting AFFARS 5352.223-9001 in his initial COVID-19 directions, warning that more would follow, and reciting Chugach's procedures for seeking equitable adjustments, we find the contracting officer recognized that all these directives would fall within the scope of the clause.

8.  By letter from Chugach's president, dated April 14, 2020, to Colonel Cornwell (copied to the contracting officer), Chugach notified the government that it estimated the cost to comply with the quarantine would be approximately $300,000 (R4, tabs 51-51a at 1).  Colonel Cornwell responded by email dated April 21, 2020 (copied to the contracting officer), stating he "respect[ed] [Chugach's] right to file for equitable adjustment in the event there are additional costs incurred for complying with [his] policy, those of the states, or installation commanders" (R4, tab 54).

9.  Chugach or its subcontractor, Chenega, quarantined workers bound for one or more contract locations (app. br. at 4-6; govt br. at 7).  Chugach submitted certified claims for costs associated with the quarantine of its workers, or those of Chenega,

4

DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

which the contracting officer denied (R4, tabs 24-27; 76-77). Chugach timely appealed the government denial of its claims.

## DECISION

Chugach's brief is unclear as to whether the quarantined employees at issue worked only at Eareckson Air Station or at all three of the installations. We need not resolve that matter because this entitlement ruling respecting the quarantine applies the same regardless of where they worked.

Chugach does not appear to quarrel with Colonel Cornwell's judgment imposing the quarantine upon entry to the PRSC installations. The devasting effect of COVD-19 upon the lives of numerous individuals and the nation's ability to function are well known, especially prior to the introduction of vaccines. There is no dispute that the relevant installations are very remote and lightly manned, with limited medical support. Their mission is critical. Certainly, it was prudent for the government to impose quarantines to reduce the chance of widespread introduction of the virus into their populations. But this matter is not about the wisdom of the government's quarantine. It simply presents the classic question of who bears its costs under the contract. Our view is that the government does.

To address contingencies such as unexpected health and safety threats, the government incorporated AFFARS 5352.223-9000 into this contract. The clause, in addition to requiring compliance with the contract's specific health and safety requirements, also mandates that Chugach comply with installation health and safety rules that concern related activities not directly addressed in the contract, take all reasonable steps and precautions to preserve the health and safety of personnel performing or in any way coming in contact with the performance of the contract, and "[t]ake such additional immediate precautions as the contracting officer may reasonably require for health and safety purposes." It adds that the contracting officer may direct "health/safety standards as may be required in the performance of this contract." Likely to reduce contractor concerns about unexpected costs arising from such instructions, it expressly provides that "any adjustments resulting from such directions will be in accordance with the Changes clause." (Finding 2) That clause, in turn, provides for an equitable adjustment for contracting officer-imposed changes to the work, including to the method or manner of performance. FAR 52.243-4. AFFARS 5352.223-9000 is no mere technical boilerplate, given that it stresses that a violation of its rules and requirements are grounds for termination for default unless promptly corrected (finding 2).

Here, we are presented with a series of instructions to Chugach, beginning with the contracting officer quoting AFFARS 5352.223-9001 and requiring adherence to Colonel Cornwell's directions regarding the effects of COVID-19 on the health of

DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

personnel in PRSC's remote facilities, including that consideration be given to rotating high risk personnel and limit interaction.  The contracting officer warned that further policies would be issued and noted the procedures for seeking equitable adjustments if any required actions resulted in an increase or decrease in the cost of, or time required for, performance of the contract.  (Finding 4)  That was followed by another direction from the contracting officer, again citing the clause, requiring Chugach to coordinate with unions and personnel, including subcontractors, to reduce the number of new personnel introduced into installation populations.  He also directed Chugach to adhere to federal and state travel restrictions, especially regarding self-isolation and/or quarantine timelines.  (Finding 5)  As predicted by the contracting officer, three more directives to Chugach followed that included the contracting officer within the communications.  The first, from Colonel Cornwell, required that, "prior to entering a PRSC installation, all PRSC personnel (military and civilians), . . . and contractors, transiting to a PRSC installation shall abide by self-quarantine requirements set forth by installation commanders en route, and comply with applicable state and local health mandates."  (Finding 6)  The second, from the program manager, explained that Colonel Cornwell's intent was to require all Chugach employees desiring to travel to Wake Island, King Salmon Air Station, or Eareckson Air Station to have quarantined for a minimum of 14 days.  The third, again from Colonel Cornwell, clarified that personnel traveling to PRSC installations in Alaska shall abide by a 14-day self-quarantine in Alaska prior to traveling to the installation, while personnel traveling to Wake Island should self-quarantine in their residence prior to traveling through Hawaii.  (*Id.*)

We are satisfied that these quarantine directives issued to slow the spread of COVID-19 at these remote facilities were within the scope of AFFARS 5352.223-9001(b).  Indeed, the contracting officer recognized they were.  (Finding 7)  Also, both he and Colonel Cornwell acknowledged Chugach's right to request an adjustment seeking the costs to comply with the required actions (findings 4, 7-8).  Nevertheless, the government contends now that because the quarantine encompassed everyone who would travel to the sites, AFFARS 5352.223-9001's provisions are inapplicable.  The quarantine was directed to protect the health and safety of all personnel on the sites, including contractors (finding 7).  It was a health/safety standard that, among other things, restricted the access of Chugach's personnel to the sites to perform the contract (findings 6-7).  Hence, it was "required in the performance of this contract," just like the prior directives, expressly referring to AFFARS 5352.223-9001, dictating that personnel possibly be removed and reduced in number, and requiring adherence to federal and state travel restrictions (findings 4-5).  Though the health/safety standard must be required in the performance of the contract to fall under the clause, nothing in the clause says that the standard must only apply to contractors at the installation and not to other personnel.  Indeed, that would likely be highly counterproductive.  Accordingly, the government was liable for "adjustments resulting from such direction . . . in accordance with the Changes clause."

6

DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The government primarily relies upon the sovereign acts defense to avoid liability for the quarantine costs. We've described that doctrine as follows:

> The sovereign acts doctrine provides that the government is not liable for obstructions to the performance of its contracts "resulting from its public and general acts as a sovereign." *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1574 (quoting *Horowitz v. United States*, 267 U.S. 458, 461 (1925)); *see also Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 520 (Fed. Cir. 2011). The doctrine recognizes that when the government contracts, it is functioning in a different capacity than the sovereign. As a contractor, the government is usually subject to the same rules as any other party. As the sovereign, "it stands apart." *Stockton East Water Dist. v. United States*, 583 F.3d 1344, 1366 (Fed. Cir. 2009). Accordingly, "if an act of the Government as sovereign would justify non-performance by any other defendant being sued for contract breach, then the Government as contractor is equally free from liability for non-performance." *Id.*

> Essentially, the sovereign acts doctrine permits the government as a contractor to assert an impossibility defense to claims of non-performance, to the same extent as a private party could, when the government's sovereign acts obstruct performance. Put another way, it "relieves the Government as contractor from the traditional blanket rule that a contracting party may not obtain discharge if its own act rendered performance impossible." *Stockton East*, 583 F.3d at 1366 (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 904 (1996)).

*Am. Gen. Trading & Contracting, WLL*, ASBCA No. 56758, 12-1 BCA ¶ 34,905 at 171,636. The sovereign acts doctrine is an affirmative defense. *Conner Bros. Constr. Co. v. Geren*, 550 F.3d 1368, 1371 (Fed. Cir. 2008).

The government argues extensively that the quarantine qualifies as a sovereign act because it applied to all personnel at PRSC installations and was not self-serving. Certainly, a broad restriction upon access to a military base that happens to impair contract performance, though not directed for that purpose, might constitute a sovereign act. *See Conner Bros*, 550 F.3d at 1375-79; *APTIM Fed. Servs., LLC*, ASBCA No. 62982, 22-1 BCA ¶ 38,127 at 185,219. Here, the government's goals were the protection of the health of people and their associated mission, not to relieve

DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

it of any contractual duties. However, we need not rule with certainty whether the quarantine is a sovereign act. Assuming it is, the government's attempt to avoid liability collapses by refusing to establish all the elements necessary to prevail upon a sovereign acts defense.

Even when the government engages in a sovereign act, "the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability . . . ." *Conner Bros*, 550 F.3d at 1379. "[B]ecause the sovereign acts doctrine is an affirmative defense, the government [has] the burden of establishing each element of the defense, including the "impossibility" component." *Id.* "Specifically, performance by the government is excused under the sovereign acts defense only when the sovereign act renders the government's performance impossible." *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1287 (Fed. Cir. 2008); *see also Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 521 (Fed. Cir. 2011) (noting even when the sovereign acts defense applies it does not follow that discharge will always be available because the common law doctrine of impossibility imposes additional requirements before a party may avoid liability) (citing *Carabetta Enters., Inc. v. United States*, 482 F.3d 1360, 1365 (Fed. Cir. 2007)); *Stockton E. Water Dist.*, 583 F.3d at 1366 (explaining the second part of the test is whether the act would release the government from liability under ordinary contract law principles, known in contract law as the impossibility defense) (citing *Winstar*, 518 U.S. at 896); *Am. Gen. Trading & Contracting,* 12-1 BCA ¶ 34,905 at 171,637.

To prevail under the impossibility test, "the nonoccurrence of the act in question must have been a basic assumption of the contract, and the government must not have assumed the risk that such an act would occur." *Conner Bros*, 550 F.3d at 1379; *see also Piszel v. United States*, 833 F.3d 1366, 1380 (Fed. Cir. 2016) (finding an impossibility defense fails if the contracting party assumed the risk of government regulation); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002) ("This defense requires [the government] to show that (i) a supervening event made performance impracticable; (ii) the non-occurrence of the event was a basic assumption upon which the contract was based; (iii) the occurrence of the event was not [the government's] fault; and (iv) [the government] did not assume the risk of occurrence."); *APTIM Fed. Servs.,* 22-1 BCA ¶ 38,127 at 185,219; RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981) cmt. b ("In order for a supervening event to discharge a duty under this Section, the non-occurrence of that event must have been a 'basic assumption' on which both parties made the contract . . . .").

The government maintains that it need not satisfy the impossibility test here for reasons that, quite frankly, are difficult to follow. As best we can tell, it seems to contend that it must only prove impossibility to establish a sovereign act if it claims the act made its performance impossible. This appears to imply that it is not claiming its performance was impossible, but it should still prevail on the defense. Though the

DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

government's argument lacks clarity, the case law does not. It absolutely requires application of the impossibility test as a component of the sovereign acts defense. Accepting the government's invitation to ignore it would be reversible error. *Klamath*, 635 F.3d at 522 (ruling "the Court of Federal Claims erred in holding that impossibility of performance is not a factor to be taken into account in considering the sovereign acts doctrine."). Consistent with that, we have applied the impossibility test as part of our sovereign acts analysis to this very type of fact pattern, where the government has restricted base access to a contractor as part of its wider efforts to reduce the spread of COVID-19. *APTIM Fed. Servs.*, 22-1 BCA ¶ 38,127 at 185,219.

The government's denial that it bears any burden to establish impossibility, and its failure to advance any argument supporting that component, is reason enough to reject its sovereign acts defense. In any event, the record does not support finding the government's restrictions upon Chugach's access was justified as an impossibility. There is no basis to hold that the non-occurrence of the quarantine was a basic assumption upon which the contract was based, and that the government did not assume the risk of it under the contract's terms. This again is clearly demonstrated by AFFARS 5352.223-9001(b). As we previously noted that clause contemplated that Chugach was subject to directed government health/safety standards as may be required in the performance of the contract. A quarantine imposed for the protection of health and safety of all personnel performing the installations' critical mission, including contractors, that restricted contractor access to perform the contract is within the scope of this provision, regardless of whether it additionally restricted non-contract personnel, and is therefore an occurrence that was a basic assumption upon which the contract was based. The clause placed the financial risk of such an action squarely upon the government by providing that "adjustments resulting from such direction will be in accordance with the Changes clause." AFFARS 5352.223-9001(b). Given that the standards for impossibility are not satisfied, even if the quarantine is a sovereign act, the sovereign acts defense does not shield the government from liability under AFFARS 5352.223-9001. *See also D & L Constr. Co. v. United States*, 402 F.2d 990, 999 (Ct. Cl. 1968) ("[T]he Government can agree in a contract that if it does exercise a sovereign power, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act . . . ."). Chugach is entitled to the equitable adjustment authorized by AFFARS 5352.223-9001(b).

9

DOCUMENT FOR PUBLIC DISTRIBUTION
This decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

CONCLUSION

We sustain the appeals on entitlement, finding that Chugach may recover an equitable adjustment based upon its costs (including those passed through by its subcontractor) resulting from the quarantine. The appeals are remanded to the parties to address quantum.

Dated: October 2, 2024

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur
w

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62712, 62713, 62877, Appeals of Chugach Federal Solutions, Inc., rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

10