# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| ECC International, LLC | ) ASBCA No. 60484 |
| | ) |
| Under Contract No. W5J9LE-11-C-0045 | ) |

APPEARANCES FOR THE APPELLANT:     R. Dale Holmes, Esq.
                                                  Michael A. Richard, Esq.
                                                     Cohen Seglias Pallas Greenhall & Furman PC
                                                        Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT:     Michael P. Goodman, Esq.
                                                  Engineer Chief Trial Attorney
                                                  Sarah L. Hinkle, Esq.
                                                  Matthew S. Tilghman, Esq.
                                                  Engineer Trial Attorneys
                                                  U.S. Army Engineer District, Middle East
                                                  Winchester, VA

## OPINION BY ADMINISTRATIVE JUDGE WOODROW
## ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

Pending before the Board are the parties' cross-motions for summary judgment filed by appellant, ECC International, LLC (ECCI), and the United States Army Corps of Engineers (USACE or government). ECCI seeks summary judgment on entitlement to its monetary claim for costs arising out of the government's closure of the Friendship Gate, an access route to ECCI's construction site on Camp Shorab in Afghanistan. The government moves for summary judgment on the grounds that the government's closure of Friendship Gate was a sovereign act and ECCI assumed the risk of any changes to base access procedures or requirements.

We hold that the plain language of the contract states that the contractor bears the risk of changes to base access requirements and that the closure of Friendship Gate was not a constructive change to the terms of the contract. We further hold that the government did not create an implied warranty of access through Friendship Gate, and that ECCI's previous contracts at Camp Shorab in Afghanistan did not create an implied warranty of continued access to the project site through Friendship Gate.

We do not reach the government's affirmative defense that the closure of the Friendship Gate was a sovereign act, because we have concluded that there is no express

or implied contractual right of access through the Friendship Gate and that the closure of Friendship Gate was not a constructive change.

Therefore, we grant the government's motion for summary judgment and deny the appeal.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

A. The Contract

1. On June 29, 2011, USACE issued Solicitation No. W5J9LE-11-B-0004 (solicitation) requesting proposals from prospective bidders for the site adapt, design and construction of the 215th compound expansion, Camp Shorab, Helmand Province, Afghanistan (R4, tab 3 at 1).

2. The solicitation contained the following provision relating to compliance with orders relating to force protection:

> **C3 CLAUSE 952.225-0002 ARMED PERSONNEL INCIDENT REPORTS (SEP 2010)**
>
> (a) All contractors and subcontractors in the United States Forces-Iraq (USF-I) or United States Forces-Afghanistan (USFOR-A) theater of operations shall comply with and shall ensure that their personnel supporting USF-I or USFOR-A forces are familiar with and comply with all applicable orders, directives, and instructions issued by the respective USF-I or USFOR-A Commanders relating to force protection and safety.

(R4, tab 3 at 50)

3. Section 01040 of the solicitation contained the following provision relating to security in a wartime contingency environment:

> **1.0 SPECIFIC CONTRACT SECURITY ASSESSMENT**
>
> The Contractor will construct the Project in an active war zone where International Security Assistance Forces (ISAF) may conduct offensive and defensive operations against a variety of hostile forces, to include members of the Taliban. The Contractor understands that it may not receive any

2

support whatsoever in securing the Project site and in securing the transportation of materials to the Project site.

(R4, tab 3 at 170)

4. Section 01040 of the solicitation further stated that the contractor is responsible for its own security and securing the transportation of materials to the project site. "Neither U.S. Government nor other ISAF forces are available to provide exclusive security for the Project. The Contractor is responsible for securing the Project site and in securing the transportation of materials to the Project site." (R4, tab 3 at 170)

5. The solicitation included the following language regarding the operations of ISAF or hostile forces:

The Contracting Officer possesses no ability to control the operations of either ISAF or hostile forces. The Government, acting in its sovereign capacity in its prosecution of its operations, may take actions which directly or indirectly affect the Contractor. These kinds of acts are general in application, not specifically directed at the Contractor. The Contractor recognizes that such actions may be taken, and that they will not entitle the Contractor to make claims for excusable or compensable delays.

(R4, tab 3 at 170)

6. The solicitation required the contractor to formulate its own security plan, taking into account the changing operational picture in the region.

The Contractor possesses sufficient information about the specific security situation at the site to enable it to formulate an appropriate security plan. The Contractor understands that the security situation at the Project is subject to significant transformation in a short time span based on the changing operational picture in the region. The Contractor's security plan will take this factor into account.

(R4, tab 3 at 170)

7. On July 30, 2011, ECCI submitted a proposal in response to the solicitation in the amount of $29,904,252 (R4, tab 36). The proposal included the following statement: "ECC International, LLC agrees with all terms, conditions, and provisions included in the

3

solicitation and agrees to furnish any or all items upon which prices are offered at the price set opposite each item" (*id.* at 1).

8. On August 11, 2011, USACE awarded Contract No. W5J9LE-11-C-0045 to appellant (R4, tab 37).

9. The contract incorporated by reference the terms of the solicitation (R4, tab 5 at 2).

10. Contract section 01010, Scope of Work, ¶ 2.2, Security, provides that "[a] detailed security plan in accordance with Section 01040 SECURITY shall be approved by the Government before construction notice to proceed" (R4, tab 3 at 68, 71).

11. Contract section 01040, ¶ 5.0, Security Plan, states:

> The Security Officers will review and approve all current and future Contractor security plans prior to submittal approval by the authorized representative of the Contracting Officer. The Security Officers shall ensure that all Contractor security plans are in accordance with the Contract requirements. The security plans shall address movement of Contractor labor, material, and equipment. The Security Officers will lead the quality assurance program to ensure Contractors are executing their approved security plans. The Government will not allow the Contractor to start work on the Project site without an approved security plan.

(R4, tab 3 at 171)

12. During performance of the contract, ECCI prepared both a Security Plan and an Area Use Plan that contemplated use of the Friendship Gate for moving workers from its existing Life Support Area (LSA) on Camp Leatherneck to the project site on Camp Shorab (R4, tab 38).

13. ECCI's Security Plan and Area Use Plan contemplated use of the Friendship Gate for moving concrete from the concrete batch plants on Camp Leatherneck or Camp Bastion to the project site (R4, tab 38; app. mot., Canon aff. ¶ 16).

14. ECCI's proposed Area Use Plan expressly stated that it "is a discussion document for further evaluation in cooperation with USACE management" (R4, tab 38 at 7).

4

15. The government approved ECCI's Area Use Plan and Security Plan (R4, tab 40).

16. ECCI used the Friendship Gate to get workers and materials to the project site without having to process Afghan workers through the Afghan National Army (ANA) Entry Control Points (ECPs) onto Camp Shorab (Canon aff. ¶ 17).

17. From the beginning of contract performance, ECCI used Friendship Gate to access the project site for materials and concrete from the batch plants on Camp Leatherneck or Camp Bastion, and for personnel from ECCI's LSA at Camp Leatherneck (Canon aff. ¶ 18).

B. ECCI's Prior History at ANA Shorabak

18. At the time of the contract performance in 2011, the ANA Shorabak installation consisted of three adjacent camps of NATO forces operating as the International Security Assistance Forces (ISAF), and ANA forces operating on behalf of the country of Afghanistan. All of these camps are enclosed by a wall or a fence, with access through secure ECPs. (Canon aff. ¶ 4)

19. The three adjacent camps at ANA Shorabak consisted of: 1) Camp Bastion, a walled compound that was run by British military personnel as a part of the ISAF forces; 2) Camp Leatherneck, a walled compound that was run by U.S. Marines as a part of the ISAF forces; and 3) Camp Shorab, a walled compound controlled by ANA troops, with ECPs that were run by the ANA troops which is where, as discussed above, the contract was performed (Cannon aff. ¶¶ 4-5; R4, tab 3 at 68).

20. Prior to entering into the contract at issue in this appeal, ECCI had performed six projects for ISAF forces at ANA Shorabak, including: 1) Contract No. FA8903-06-D-85, Task Order 54, awarded by the Air Force, for construction of Forward Operating Base K and AK, on Camp Tombstone (part of Camp Shorab); 2) Contract No. FA8903-06-D-8511, Task Order 68, awarded by the Air Force, for construction of the Medical Facility Expansion, on Camp Bastion; 3) Contract No. W5K9FH-11-C-01012, awarded on November 10, 2010, by the U.S. Army Regional Contracting Command, for construction of classrooms at the Regional Military Training Center (RMTC) on Camp Shorab; 4) Contract No. W5K9FH-11-C-0123, for construction of a power plant for the RMTC on Camp Shorab; 5) Contract No. W5J9JE-10-D-0022, Task Order 003, awarded by USACE on January 31, 2011, for design and construction of a firing range complex for the ANA on Camp Shorab; and 6) Contract No. W5J9JE-10-D-0022, Task Order 4, awarded by USACE on April 15, 2011, for design and construction of the ANA 3/215[th] FSD on Camp Shorab. (Canon aff. ¶ 3)

5

21. For its previous projects at ANA Shorabak, ECCI had utilized an LSA located on Camp Leatherneck (Canon aff. ¶ 6).

22. During performance of its previous projects, ECCI had used an ECP, called Friendship Gate, between Camp Leatherneck and Camp Shorab, which allowed contractors to have efficient access to projects on ANA Shorabak (Canon aff. ¶¶ 7-8).

23. Friendship Gate allowed ECCI to move workers and materials efficiently between its LSA on Camp Leatherneck and projects sites located on Camp Shorab, without going through any of the ECPs controlled by ANA troops for ANA Shorabak (Canon aff. ¶ 11).

24. During performance of its previous projects, ECCI used Friendship Gate to move airfreighted materials efficiently onto Camp Shorab (Canon aff. ¶¶ 9-11).

25. During performance of its previous projects, ECCI used concrete batch plants operated by four Afghan subcontractors located on Camp Leatherneck and Camp Bastion. ECCI used Friendship Gate to move its concrete from the batch plants onto Camp Shorab. (Canon aff. ¶¶ 9-11)

26. The current contract was located on Camp Shorab, which had two access points, an ECP controlled by the ANA forces, and Friendship Gate, controlled by ISAF forces (Canon aff. ¶ 12).

C. The Closure of Friendship Gate

27. In early December, 2012, due to a security incident and a reasonable threat of attack on ANA Shorabak by hostile forces, the U.S. Marine Corps (USMC) forces controlling Camp Leatherneck closed the access to ANA Shorabak via the Friendship Gate until further notice to all personnel, except for ISAF and the military. The Camp Bastion Main Entry Point was similarly closed for two days. (R4, tab 102)

28. Subsequently, the USMC closed the Friendship Gate permanently, except to ISAF badge holders and "the military" (R4, tab 103).

29. ECCI and its Afghan subcontractors were required to move concrete from batch plants on Camp Bastion and Camp Leatherneck, and workers from ECCI's LSA on Camp Leatherneck, off of the security controlled compound, to roads nearby, and then through ANA's ECP onto Camp Shorab. Specifically, because ECCI's LSA was located inside the perimeter of Camp Bastion, the closure of Friendship Gate resulted in a longer access route to and from ANA Shorabak for ECCI's workers. (R4, tabs 102-03)

6

30. ECCI maintained its LSA on Camp Leatherneck and eventually established an additional LSA on ANA Shorabak. Appellant received permission to pump concrete over the fence from Camp Leatherneck into ANA Shorabak as an alternative to transport the material through the available base access point. (R4, tab 132)

D. Appellant's Claims

31. On June 16, 2013, appellant submitted a request for equitable adjustment (REA) to the USACE contracting officer seeking compensation for four issues. The only issue relevant to this appeal was the closure of Friendship Gate, for which appellant claimed 28 days of compensable delay at a cost incurred for both appellant and its subcontractors of $1,652,958. (R4, tab 155)

32. On August 29, 2013, USACE denied appellant's REA relating to the closure of Friendship Gate. The contracting officer cited paragraph 1.0 of section 01040 of the contract and stated: "The closures of the Friendship Gate were based on a decision made by the U.S. Marines located on FOB Bastion. The closures of the Friendship Gate were not a USACE decision; USACE did not sanction the decision, nor was USACE consulted about the decision in advance." The letter further stated that there was not sufficient documentation to evaluate the claim for time. (R4, tab 169 at 1-3)

33. On September 12, 2013, ECCI provided additional documentation in support of its REA for a 28-day time extension (R4, tab 172).

34. On December 18, 2013, the contracting officer reiterated its position regarding the closure of Friendship Gate issue: "I find that the Government's position in Serial Letter C-0060, dated August 29, 2013 remains unchanged. The closure of FG was an act of the USMC/U.S. Government acting in its sovereign capacity." (R4, tab 176 at 7)

35. On December 10, 2015, ECCI submitted a certified claim in the amount of $1,439,295.91 for costs to relocate its LSA to ANA Shorabak and for claims by ECCI's subcontractors RECON and PROCON for the closure of Friendship Gate. The claims by the subcontractors included delay costs. (R4, tab 184)

36. USACE did not issue a contracting officer's final decision on ECCI's certified claim, nor did USACE inform ECCI of a date by which a final decision would be issued (answer ¶ 33).

37. On March 2, 2016, ECCI appealed the deemed denial of ECCI's certified claim for $1,439,295.91.

## DECISION

### I. Standard of Review

We will grant summary judgment only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Once the moving party has met its burden of establishing the absence of disputed material facts, then the non-moving party must set forth specific facts, not conclusory statements or bare assertions, to defeat the motion. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984). The fact that both ECCI and the government have moved for summary judgment does not require us to grant summary judgment for one side or the other; both motions can be denied in the event that there are material factual disputes regarding each motion. *See, e.g., Mingus*, 812 F.2d at 1391.

### II. Whether the Contract Warrants Continued Access through Friendship Gate

Appellant contends that, by requiring ECCI to obtain government approval of its security plan, "the Government impliedly warranted that no additional requirements would be imposed" (app. resp. at 7-8). We hold that the government did not create an implied warranty of access through the Friendship Gate.

"[A] warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself." *Oman–Fischbach Int'l (JV) v. Pirie*, 276 F.3d 1380, 1383 (Fed. Cir. 2002) (citing *Dale Constr. Co. v. United States*, 168 Ct. Cl. 692, 699 (1964)). To establish that an implied warranty of access through the Friendship Gate, ECCI must demonstrate that: (1) USACE assured ECCI that it could access the construction site through the Friendship Gate; (2) that ECCI had no duty to determine whether access would be available; and (3) access through the Friendship Gate became unavailable. *J.E. McAmis, Inc.*, ASBCA No. 54455 *et al.*, 10-2 BCA ¶ 34,607 at 170,570 (citing *Oman–Fischbach*, 276 F.3d at 1385).

ECCI's argument draws inferences where none are warranted. The contract's requirement that the government approve ECCI's security plan prior to beginning construction contains no language implying an exclusive right to use a particular access route (SOF ¶¶ 10-11). Merely requiring government approval of the contractor's security plan does not enshrine the elements of the plan as enforceable contract terms. As the

8

government observes, the content of the contractor's security plan was not incorporated into the terms of the solicitation or contract (gov't resp. at 7). Instead, the contract simply required government approval of the plan prior to beginning construction (SOF ¶ 6).

The plain language of the contract placed ECCI on notice that it was operating in a wartime contingency environment (SOF ¶ 3). The contract expressly gave ECCI the responsibility of complying with applicable installation access procedures and requirements (SOF ¶ 2). In addition, the contract states that USACE had no control over installation access decisions or procedures (SOF ¶ 5). Finally, the contract stated that access procedures could change at any time in a wartime contingency environment (SOF ¶ 3). The solicitation explicitly placed ECCI on notice that the security situation could change in a contingency environment and that ECCI's security plan should take that possibility into account (SOF ¶ 6). Taken together, these provisions fall well short of the requirement of an implied warranty that ECCI could access the construction site through the Friendship Gate.

Moreover, ECCI's proposed Area Use Plan expressly states that it "is a discussion document for further evaluation in cooperation with USACE management" (SOF ¶ 14). This description undercuts ECCI's argument that the terms of its Area Use Plan became binding contractual commitments.

ECCI contends that, by accepting ECCI's proposed price premised on the use of the Friendship Gate, the government impliedly warranted that ECCI would be able to continue to use the access route (app. resp. at 7). This argument is premised on the assumption that USACE knew that ECCI's price included a discount for the use of the Friendship Gate. However, this fact is not set forth in either party's proposed findings of fact and we are unwilling to infer that knowledge based on the record before us.

III. Whether ECCI's Prior Contracts Give Rise to an Implied Warranty of Continued Access through Friendship Gate

Given that the language of the contract did not create an implied warranty of continued access through Friendship Gate, we next address whether the parties' prior course of dealing created an implied contractual right to use the gate.

Our law regarding course of dealing relies upon the standards set forth in the Second Restatement of Contracts. *See, e.g., BAE Systems Technology Solutions & Services, Inc.*, ASBCA No. 57581, 13 BCA ¶ 35,414 at 173,741-42; *Comptech Corp.*, ASBCA No. 55526, 08-2 BCA ¶ 33,982 at 168,083-85. The binding law in our circuit draws from the Restatement as well. *See Sperry Flight Systems Div. of Sperry Rand Corp. v. United States*, 548 F.2d 915, 922-23 (Ct. Cl. 1977). A prior course of dealing, if

established, can extinguish an otherwise explicit contractual requirement. *Comptech*, 08-2 BCA ¶ 33,982 at 168,085. The Restatement provides that:

### § 223. Course of Dealing

(1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

(2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.

RESTATEMENT (SECOND) OF CONTRACTS § 223 (1981).

With respect to the "parties to an agreement" requirement, the Board has held that "[j]ustifiable reliance on a prior course of dealing requires proof of the same contracting agency, the same contractor, and essentially the same contract provisions." *Tekkon Engineering Co.*, ASBCA No. 56831, 10-2 BCA ¶ 34,563 at 170,441. To establish a course of dealing, based upon conduct, appellant must show: "actual knowledge by both parties of consistent conduct by one party in its contract dealings with the other *over an extended period of time* regarding a particular contract provision upon which the other is reasonably entitled to rely." *Comptech*, 08-2 BCA ¶ 33,982 at 168,086 (emphasis added).

In this appeal, ECCI fails to establish a course of dealing with respect to access to Camp Shorab through the Friendship Gate. First, only two of ECCI's six previous contracts were with the "same contracting agency" as the contract with USACE (SOF ¶ 20). *U.S. Flag & Signal Co.*, ASBCA No. 27049, 83-1 BCA ¶ 16,196 at 80,468 (in "establishing a course of dealing...the Government is not a monolithic body where the activities of the separate agencies or departments are involved").

Moreover, the record does not establish that USACE had actual knowledge of ECCI's previous contracts with the Air Force and the Army Regional Contracting Command, nor does it establish that USACE knew that ECCI exclusively would rely on the use of Friendship Gate to move materials and works to the project. *Transco Contracting Co.*, ASBCA No. 25315, 82-1 BCA ¶ 15,516 at 76,973 (holding that reasoning underlying the prior course of dealing rule requires that both parties have an actual knowledge of the prior course of dealing and of its significance to the contract). ECCI's allegation that it "anticipated at the time of bidding the Contract that it would continue to use Friendship Gate" is insufficient to demonstrate that USACE possessed

actual knowledge that ECCI would exclusively rely on Friendship Gate for project access (app. mot. at 5).

Second, ECCI's two concurrent contracts with USACE fall short of establishing a course of dealing.

> While there is no magic number of contracts that must be performed before this principle is applicable, the parties' prior dealings must be regular and/or numerous enough to cause a reasonable expectation that the conduct relied upon was not mere accident or mistake, but was the performance actually expected by the other party.

*Western States Constr. Co.*, ASBCA No. 37611, 92-1 BCA ¶ 24,418 at 121,894; *C.R. Pittman Constr. Co.*, ASBCA No. 54901, 08-1 BCA ¶ 33,777 at 167,178. Here, ECCI's two contracts with USACE ran concurrently with the instant contract although they began some months before the award of the subject contract. ECCI cannot rely on concurrent contracts to establish a course of dealing "over an extended period of time" as required in *Comptech* and in multiple other decisions. *See, e.g., Davis Group, Inc.*, ASBCA No. 48431, 95-2 BCA ¶ 27,702 at 138,092 (cases where a course of dealing has been found have involved consistent government actions over the course of several contracts between the same parties); *L.W. Foster Sportswear Co. v. United States*, 405 F.2d 1285 (Ct. Cl. 1969) (200,000 jackets delivered over the performance of five or six previous contracts sufficient to establish course of dealing). Finally, the contract term at issue is not the sort amenable to change by prior course of dealing. No prior course of dealing could change the fact that, in a war, security considerations could change over time, leading to "actions which directly or indirectly affect the Contractor" (SOF ¶ 5). Put another way, the fact that Friendship Gate had not previously been closed did not form a "basis of understanding" that it would never be closed as circumstances required. *See* RESTATEMENT (SECOND) OF CONTRACTS § 223(1). Therefore, we hold that ECCI's previous contracts fail to establish a course of dealing sufficient to imply a contractual right to access through the Friendship Gate.

### IV. Whether the Closure of Friendship Gate Was a Constructive Change

ECCI next argues that the closure of Friendship Gate was a constructive change to the contract and that there was no expectation that ECCI's approved Area Use and Security Plans would be changed as the need arose (app. resp. at 8). Specifically, ECCI contends that the government's pre-construction approval of ECCI's Security and Area Use Plans "rendered ECCI's chosen access route a term of the contract" (*id.*). Consequently, closing off the access route was a constructive change to the contract terms.

11

In response, the government points to language in the contract placing ECCI on notice that access procedures are subject to change depending on security concerns and that ECCI is responsible for complying with all access and security procedures. According to the government, the contract expressly states that the contractor bears the risk of changes to base access requirements. (Gov't resp. at 9-10)

According to ECCI, the contract's statement – that security procedures may change – does not excuse the government from compensating ECCI for additional costs associated with changes to those procedures (app. mot. at 16). ECCI relies on *Morrison-Knudsen Co. v. United States*, 397 F.2d 826 (Ct. Cl. 1968), to support its contention that providing a general warning that site conditions might change does not write out the changes clause from the contract. *Morrison-Knudsen*, however, does not apply to this case.

*Morrison–Knudsen* resolves conflicts between a general changes clause and other contract provisions in favor of the standard changes clause. 397 F.2d at 829. In *Morrison–Knudsen*, the contract specified the location of borrow pits for road construction. When the specified borrow pits did not produce proper materials, the contractor sought to adjust the contract price to account for changing borrow pits. The government's specifications had necessitated the change. Yet a specific contract provision denied the contractor any compensation for changes unless the total cost of contract adjustments exceeded 25% of the contract price. Because the borrow pit change did not reach the 25% cutoff, the contract in *Morrison–Knudsen* shifted the entire cost of the defective specifications to the contractor. Noting that these circumstances altered "the entire contemplated basis for performance of the contract," 397 F.2d at 844, the Court of Claims determined that the changes clause should override the 25% clause.

This case is different, because it does not involve a change to a contract specification. Unlike the contract in *Morrison-Knudsen*, which specified which borrow pits to use, the contract here does not specify or require ECCI to use a particular access point. As we established previously, the requirement that the government approve ECCI's Security Plan and Area Use Plan does not create a contractual right of access through Friendship Gate. To the contrary, the contract expressly requires ECCI to change its security plan when conditions warrant: "The Contractor understands that the security situation at the Project is subject to significant transformation in a short time span based on the changing operational picture in the region. The Contractor's security plan will take this factor into account." (SOF ¶ 6)

Because a change to access procedures, including closing Friendship Gate, does not involve a change to any contractual term, there is no conflict with the changes clause of the contract. Therefore, the closure of Friendship Gate is not a constructive change to the contract.

12

## V. The Sovereign Acts Defense

The sovereign acts defense is simply that the government, when sued as a contractor, cannot be held liable for its general and public acts as a sovereign. *Horowitz v. United States*, 267 U.S. 458, 461 (1925); *Conner Bros. Constr. Co. v. Geren*, 550 F.3d 1368 (Fed. Cir. 2008). A sovereign act is one taken in the national interest and is public and general in application. *Altanmia Commercial Marketing Co.*, ASBCA No. 55393, 09-1 BCA ¶ 34,095. The "sovereign acts" defense is an affirmative defense, *see Orlando Helicopter Airways, Inc. v. Widnall*, 51 F.3d 258, 261 (Fed. Cir. 1995), for which the defending party bears the burden of proof. *DynCorp*, ASBCA No. 49714, 97-2 BCA ¶ 29,233 at 145,430.

The government contends that the decision to close Friendship Gate was a sovereign act and that it is not liable for ECCI's costs associated with the gate's closure, because the decision to close the gate was made by the USMC while participating in an ISAF mission. USACE further contends that none of the recognized exceptions to the sovereign acts doctrine apply in this appeal, because the closure did not economically benefit the government or release the government from any of its contractual obligations. (Gov't resp. at 13-14)

ECCI, in response, contends that the decision to close Friendship Gate was not a sovereign act of the U.S. Government, because the decision was made by the ISAF, a NATO-based international organization (app. mot. at 18). According to ECCI, the sovereign acts doctrine does not apply to acts of a foreign entity.

In this appeal, we need not address whether the government's decision to close Friendship Gate was a sovereign act. Because we have concluded that there is no express or implied contractual right of access through the Friendship Gate, and that the closure of Friendship Gate was not a constructive change, we need not address the government's defense that the decision to close Friendship Gate was a sovereign act.

13

## CONCLUSION

The Board grants the respondent's motion for summary judgment and denies the appeal.

Dated: November 16, 2018

KENNETH D. WOODROW
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60484, Appeal of ECC International, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

14