ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of - | ) | |
| | ) | |
| The Haskell Company | ) | ASBCA Nos. 63332, 63586 |
| | ) | |
| Under Contract No. N69450-19-D-0909 | ) | |
| Task Order No. N69450-19-F-0874 | ) | |

APPEARANCES FOR THE APPELLANT:　　James E. Krause, Esq.
　　　　　　　　　　　　　　　　　　　James A. Galloway, Esq.
　　　　　　　　　　　　　　　　　　　　James E. Krause, P.A.
　　　　　　　　　　　　　　　　　　　　Jacksonville, FL

APPEARANCES FOR THE GOVERNMENT:　　Allison M. McDade, Esq.
　　　　　　　　　　　　　　　　　　　　Navy Chief Trial Attorney
　　　　　　　　　　　　　　　　　　　J. Alexandra Fitzmaurice, Esq.
　　　　　　　　　　　　　　　　　　　Amy L. Zobel, Esq.
　　　　　　　　　　　　　　　　　　　　Trial Attorneys


OPINION BY ADMINISTRATIVE JUDGE WITWER
ON RESPONDENT'S MOTION FOR SUMMARY JUDGMENT


　　　　This appeal arises from the Department of the Navy's year-long closure of the Atlantic Undersea Test and Evaluation Center (AUTEC) on Andros Island in the Bahamas undertaken in response to the COVID-19 pandemic. The Haskell Company, a construction contractor performing work at AUTEC under a fixed-price task order, alleges that its work was hindered, disrupted, impacted, and delayed by the Navy's actions and inactions during the pandemic. The Navy has moved for summary judgment on the ground that the sovereign acts doctrine bars Haskell's claims.

　　　　We grant the Navy's motion in part and deny it in part. We hold that the decision to close AUTEC and exclude Haskell from the base was a valid exercise of sovereign authority. Haskell has not raised a genuine dispute of material fact that the closure was specifically directed at Haskell or undertaken to financially benefit the government in connection with this contract. Accordingly, Haskell's claim for costs arising from the base closure is barred by the sovereign acts doctrine. We also grant the Navy's motion with respect to costs Haskell incurred in replanning the project following the base's reopening, including implementing public health measures that made base access more difficult.

　　　　We deny the motion with respect to offsite work that may not have required base access, as the Navy has not demonstrated that such work was rendered impossible

or that no material facts remain in dispute. We also deny summary judgment with respect to one category of replanning costs that Haskell attributes to coordination conflicts that allegedly arose after the base reopened, when multiple projects resumed concurrently (hereinafter "logistical bottleneck costs"). Regarding these costs, we find the briefing and record insufficiently developed for us to grant summary judgment.

<u>STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION</u>

*The Base Contract*

1. The following facts are undisputed. On February 22, 2019, the Naval Facilities Engineering Systems Command (NAVFAC) Southeast awarded Contract No. N69450-19-D-0909 to Haskell (hereinafter the "base contract") (GSUMF ¶ 1; app. resp. to GSUMF ¶; R4, tab 1).[1] The base contract was one of five fixed-price, indefinite-delivery, indefinite-quantity (IDIQ) contracts awarded under a multiple-award construction contract for NAVFAC Southeast's area of responsibility (R4, tab 1 at GOV5).

2. The base contract incorporated by reference two Federal Acquisition Regulation (FAR) clauses relevant to the dispute: 52.242-14, SUSPENSION OF WORK (APR 1984), and 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984)) (GSUMF ¶¶ 2, 5; app. resp. to GSUMF ¶¶ 2, 5; R4, tab 1 at GOV12).

*The Task Order*

3. On September 26, 2019, NAVFAC issued Haskell a fixed-price, design-build task order for the construction of austere housing quarters at AUTEC located on Andros Island, Bahamas (R4, tab 3 at GOV977-78). AUTEC is a Navy test facility that supports Research, Development, Test and Evaluation (RDT&E) efforts, as well as fleet training, certification, and proficiency exercises. It operates a deep-water range facility, which is used by agreement with the Royal Navy of the United Kingdom and the Bahamas. The base supports both a permanent onsite workforce and visiting users who conduct exercises and tests at the range.[2] (GSUMF ¶¶ 7-8, 10-12; app. resp. to GSUMF ¶¶ 7-8, 10-12; gov't mot., ex. A at GOV2629; Woodcock aff. ¶ 3-6; R4, tab 2 at GOV344)

---

[1] GSUMF refers to the Government's Statement of Undisputed Material Facts.

[2] AUTEC is a detachment of the Naval Undersea Warfare Center (NUWC) Newport Division in Newport, Rhode Island. The NUWC Newport Division is a Field Activity of Naval Sea Systems Command (NAVSEA). (GSUMF ¶¶ 7-8, 10-12; app. resp. to GSUMF ¶¶ 7-8, 10-12; gov't mot., ex. A at GOV2629; Woodcock aff. ¶ 3-6; R4, tab 2 at GOV344)

4. The task order was intended to address deficiencies in AUTEC's existing housing. It required Haskell to remove substandard existing housing units and construct a new, two-story austere housing facility. (R4, tab 2 at GOV344)

5. The task order included a clause titled "Anticipated Restricted Delays," which provided that, if the installation were closed for more than five lost workdays in a calendar year, the contracting officer would issue a no-cost contract modification extending the contract completion date if the critical path was impacted (R4, tab 2 at GOV84).

6. NAVFAC issued Haskell written Notice to Proceed with the design phase in October 2019 (R4, tab 20A-Ex.2 at GOV1727). Under the task order, Haskell was to complete construction within 816 calendar days from the date of award (R4, tab 3 at GOV982; app. opp'n at 9).

*COVID-19 Pandemic and the Base Closure*

7. We take judicial notice that, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. In response, the Government of the Bahamas issued a series of emergency public health orders throughout 2020 and 2021. These orders imposed travel bans, quarantine requirements, and access restrictions, both within the country and for those entering from abroad. (GSUMF ¶ 23; app. resp. to GSUMF ¶ 23; gov't mot., ex. B; app. opp'n at 1-2, 9; app. supp. R4, tabs 7-62, 69)

8. The Navy command at AUTEC also implemented preventative measures to minimize the spread of the virus. On March 18, 2020, AUTEC's Officer-in-Charge, Commander Michael Woodcock, ordered the base closed to non-essential personnel "to minimize the potential threat of the coronavirus spread to the base" (GSUMF ¶¶ 24-25; app. resp. to GSUMF ¶¶ 24-25; app. opp'n at 2, 9; R4, tab 20B-Ex.2 at GOV1802-03). He emphasized that the primary purpose of the closure was to protect the health and safety of those on base (R4, tab 20B-Ex.2 at GOV1803).

9. In a follow-up communication, the Officer-in-Charge described the Restriction of Movement (ROM) protocols that would apply to personnel arriving at AUTEC. He reiterated that preventing the virus from reaching the base was his top priority, while ensuring that the base remained available for mission-essential operations. (Gov't mot, ex. C)

10. Haskell's contract was not deemed mission-essential (R4, tab 20B-Ex.2 at GOV1802, GOV1826). On March 19, 2020, NAVFAC forwarded the Officer-in-Charge's order to the Haskell and instructed the company to recall its personnel and

suspend all onsite activities at AUTEC (GSUMF ¶ 25; app. resp. to GSUMF ¶ 25; R4, tab 20B-Ex.2 at GOV1802-03).

11.  That same day, Haskell acknowledged the directive, stating that it "appreciated the command's decision to mitigate the potential transmission of the COVID-19 virus considering the remoteness of the location and heightened risk to personnel" (GSUMF ¶ 27; app. resp. to GSUMF ¶ 26; R4, tab 20B-Ex2 at GOV1804). Anticipating a prolonged closure, Haskell requested weekly coordination meetings with NAVFAC and AUTEC personnel to plan for eventual remobilization (R4, tab 20B-Ex. 2 at GOV1804).

12.  AUTEC remained closed to Haskell for approximately one year.  During that time, NAVFAC did not issue a Suspension of Work Order or a Notice to Proceed with construction.  (R4, tab 20 at GOV1693, GOV1696)

*Contract Performance During the Base Closure*

13.  During the year-long closure of AUTEC, Haskell continued work that did not require onsite access to the base.  For instance, it advanced the design phase of the task order and submitted its final design in July 2020 (GSUMF ¶ 34; app. resp. to GSUMF ¶ 34; R4, tab 20-Ex.2 at GOV1825, GOV1906).  NAVFAC accepted the final design the following month (GSUMF ¶ 37; app. resp. to GSUMF ¶ 37; R4, tab 20-Ex.2 at GOV1906).

14.  In May 2020, Haskell notified the Navy that it had begun procuring equipment and materials for the construction phase, including vehicles, trailers, cranes, and other items (R4, tab 20B-Ex.2, GOV1825-26).  Records also show that preconstruction activities were underway, including marine cargo load planning by an engineering subcontractor (*id.* at GOV1923; *see also* app. resp. to GSUMF ¶ 41 (citing R4, tab 20B-Ex.2 at GOV1908-2280)).

15.  Haskell further asserts that, even before the design phase concluded, it mobilized personnel to order, manage, and receive shipments of early materials in line with the contract schedule (R4, tab 20 at GOV1693, GOV1702).

16.  The Navy was aware that Haskell was undertaking these preparatory efforts.  During a May 2020 meeting with the contracting officer, Haskell told NAVFAC:

> Haskell and our subcontractor partners are making early
> purchase[s] in preparation for mobilizing, including
> equipment, trailers and material for early activities on the
> construction schedule.  We wanted to [] make sure the

4

government was aware of the items being purchased for this project and verify we should be proceeding this way.

* * *

Should we be purchasing material and storing state side in anticipation for the base reopening? Should we release precast for production and storing it [] stateside?

* * *

Precast has 8-12 weeks [fabrication] time after we release. We were planning on releasing the precast on June 17th. Is there any issue with this?

(GSUMF ¶ 29; app. resp. to GSUMF ¶ 29; R4, tab 20B-Ex.2 at GOV1825-27)

17. The contracting officer replied:

I cannot tell you to do it. Base commander is stopping the work, not NAVFAC. If there is risk in your actions, NAVFAC will let us know. If I felt there is a need in proceeding early with purchases, I would let you know. I don't have the authority [to] stop you, however you know the base is closed. I am advising Haskell to do nothing until we have more clarity. I don't want you in harms [sic] way.

* * *

A lot is contingent on when base commander reopens AUTEC. I don't want you to fabricate anything that is 8-12 weeks. Let's all be on the same page here. It can't be delivered to the site right now. I only pay for work in progress. If we need to extend the [construction completion date] for the fabrication we can look at that. Let's coordinate before you release large material purchase. Whatever materials you released now, you are doing at risk until the Notice to Proceed for construction activities is issued.

(GSUMF ¶¶ 30-31; app. resp. to GSUMF ¶¶ 30-31; R4, tab 20B-Ex.2 at GOV1826-27)

18.  In mid-July 2020, following completion of the final design, Haskell asked whether a Notice to Proceed with construction would be issued (R4, tab 20B-Ex.2 at GOV1834).  Later that month, Haskell renewed the request and stated its belief that NAVFAC's continued delay constituted a constructive suspension of the contract under the Suspension of Work clause (*id.*).  Haskell also clarified that it considered delay in issuing the Notice to Proceed to be distinct from the ongoing AUTEC base closure (*id.*).

19.  Haskell informed NAVFAC that the directives not to release materials were creating administrative inefficiencies and risked exposing the project to price escalations (*id.*).  Haskell also explained that the delay was generating increased labor costs, rising material and shipping prices, and higher bond and insurance premiums (*id.*).  In short, Haskell argued that NAVFAC's actions amounted to a constructive suspension of work that constrained its ability to mitigate time and cost impacts.  At the same time, Haskell informed the government that without a formal Suspension of Work Order, it would keep project personnel assigned and would seek an equitable adjustment for the associated labor costs.  (*Id.*)

20.  In an August 2020 response, the contracting officer denied the request for a Notice to Proceed, stating that "[i]t would be wholly improper, as well as impracticable, for the Government to issue a Notice to Proceed with Construction when existing circumstances are beyond the Government's control, and construction cannot commence" (GSUMF ¶ 39 (quoting R4, tab 20B-Ex.2 at GOV1907); app. resp. to GSUMF ¶ 39)).

21.  The contracting officer further emphasized:

> Until such a time the Government has issued a Notice to Proceed with Construction Activities, Haskell has not been issued the authority under this task order to mobilize or begin any construction activities.  Any incurred cost associated with mobilization or construction activities will be at the expense of Haskell; as these actions are unilateral decisions made by Haskell.  Therefore, the Government will not grant an equitable adjustment for costs associated with mobilization or construction work.  At this time, there are travel and entry restrictions imposed both in the Bahamas and AUTEC beyond the Government's control.

(R4, tab 20B-Ex.2 at GOV1904-05)  Regarding Haskell's stated intent to retain personnel absent a Suspension of Work Order, the contracting officer responded that "[t]he Government is not in a position to issue a Suspension of Work as the

6

Government has yet to issue a Notice to Proceed with Construction—there is nothing for the Government to suspend" (*id.* at GOV1907).

22. In late August 2020, Haskell again requested a partial Notice to Proceed to conduct preconstruction activities (GSUMF ¶ 40; app. resp. to GSUMF ¶ 40; R4, tab 20B-Ex.2 at GOV1909-10). NAVFAC denied the request, explaining:

> After an objective and thorough review of your request for the issuance of a partial notice to proceed, the government hereby determines that a partial notice to proceed will not be issued at this time. Until all the travel restrictions are lifted for AUTEC, Andros Island and The Bahamas, the government is not in a position to even issue a partial notice to proceed.

(GSUMF ¶ 41; app. resp. to GSUMF ¶ 41; R4, tab 20B-Ex.2 at GOV2280)

23. In sum, Haskell took the position that it was NAVFAC—not the Officer-in-Charge of AUTEC—that was preventing performance of the contract during the base closure, and that NAVFAC's actions, independent of the sovereign's base access restrictions, caused additional delays and costs. According to Haskell, NAVFAC's refusal to issue a Notice to Proceed or authorize limited preconstruction activities effectively suspended the contract and impaired its ability to mitigate the impact of the closure. The contracting officer, by contrast, contended that the work was not constructively suspended because construction could not have proceeded regardless, given the base's closure and the travel restrictions imposed by the Bahamian Government and the Officer-in-Charge.

*Phased Reopening and Notice to Proceed with Construction*

24. In June 2020, shortly before the Bahamian Government lifted its international travel ban, the Officer-in-Charge announced the development of a phased approach to reopening the base. While acknowledging the ongoing threat of COVID-19, he stated that it was "time to work towards opening [the] gate and getting AUTEC to 'The New Normal.'" (Gov't mot., ex. D at GOV2637-38) Phase I would involve a period of evaluation during which AUTEC would monitor the impact of the lifted travel ban. Dependents and visitors would be permitted to travel to AUTEC, but would be subject to both Bahamian public health requirements and Navy-imposed Restriction of Movement (ROM) protocols. Although the reopening of certain base facilities might begin during Phase I, the Officer-in-Charge noted that such efforts would "likely start small" and expand only if public health controls proved effective. (*Id.* at GOV2638)

7

25.  Phase II included plans to reopen the base to outside personnel and lift ROM requirements for local personnel.  Personnel who traveled off-island or stateside would still be subject to ROM upon return.  (*Id.* at GOV2638-39; GSUMF ¶ 32; app. resp. to GSUMF ¶ 32)  Phase III, labeled "AUTEC New Normal," allowed unrestricted travel from Navy-designated "green" locations but maintained ROM requirements for "red" locations.  The classification of locations as green or red was made by the Navy, not the Officer-in-Charge or NAVFAC.  (Gov't mot., ex. D at GOV2639)

26.  Although the record does not pinpoint the exact date AUTEC entered Phase I, it appears to have occurred soon after the phased reopening was announced (app. opp'n at 34).[3]  However, AUTEC did not transition to Phase II until March 2021—approximately nine months later.  At that time, NAVFAC informed Haskell that base access during Phase II required submission and approval of a "bubble-to-bubble" travel plan by the Officer-in-Charge.[4]  (GSUMF ¶¶ 43; app. supp. to GSUMF ¶ 43; gov't mot., ex. F at GOV2641)

27.  On February 24, 2021, Haskell received a formal Notice to Proceed with construction (R4, tab 20 at GOV1697; R4, tab 20A-Ex.6 at GOV1742-43).  The notice outlined mitigation measures necessary for Haskell to resume work at AUTEC, including health visas, daily health screenings, COVID-19 testing, quarantines, and bubble-to-bubble plans (R4, tab 20A-Ex.6 at 1742-43).

28.  In total, Haskell was excluded from the base for over a year from March 19, 2020 to April 26, 2021 (R4, tab 20 at GOV1693; gov't reply to app. resp. to GSUMF ¶ 65).

*Haskell's Claim*

29.  Haskell submitted a certified claim the contracting officer, alleging that it was not provided reasonable access to the worksite and was unable to diligently prosecute the work (R4, tab 20 at GOV1694).  Haskell sought both additional time and monetary damages (*id.* at GOV1710).  The contracting officer granted a 538-day time extension but denied the monetary request in full (R4, tabs 20A-Ex.12, 22).

30.  Haskell's claim seeks $396,775.95 in damages based on three categories of government-caused impacts:

---

[3] The exact date is not material to our decision.

[4] Although not material to our decision, we understand a "bubble" to mean a group isolating together during the pandemic.  A "bubble-to-bubble" plan allowed movement between two such groups, such as quarantined military bases, under strict protocols that avoided public contact.

(i)  Denial of access to the AUTEC base for over a year, followed by a requirement to discard its original construction plan and replan under new conditions;

(ii)  NAVFAC's delay in issuing a Notice to Proceed after design completion, along with its refusal to authorize limited procurement or subcontracting, which prevented Haskell from mitigating time and cost impacts; and

(iii)  Underutilization of key personnel mobilized during the design phase to manage shipments and materials, resulting in "personnel inefficiency" costs from May to August 2020.

(R4, tab 20 at GOV1700-01, GOV1716)

31.  After the contracting officer denied its monetary claim, Haskell appealed to the Board.

DECISION

The Navy has moved for summary judgment on its affirmative defense that Haskell's exclusion from AUTEC was a sovereign act barring recovery on any part of the claim (gov't mot. at 1).  Haskell counters that the sovereign acts doctrine does not apply for several reasons.  First, it argues that the year-long closure of AUTEC was unprecedented and unreasonable, particularly when compared to other Navy installations that remained open or reopened within weeks (app. opp'n at 2).  Second, Haskell contends that the Navy lacked probable cause for the extended closure, noting that Bahamian public health orders cited by the Navy exempted AUTEC from closure after June 2020 (*id.*).  Finally, Haskell maintains that the base closure did not render performance impossible, as its continued preconstruction activities until NAVFAC unilaterally halted its efforts (*id.*).

We grant in part and deny in part the Navy's motion.  For the reasons set forth below, we conclude that the closure of AUTEC was a sovereign act that shields the Navy from liability for costs associated with onsite work and—with one small exception—for the costs of replanning construction under new conditions following the base's reopening.  Accordingly, we grant the Navy's motion with respect to those costs.  However, we deny the Navy's motion with respect to the "logistical bottleneck costs" due to an insufficiently developed record.  We also deny Haskell's claimed preconstruction and "personnel inefficiency" costs, finding that the Navy has not demonstrated the absence of a genuine dispute of material fact regarding these aspects of the claim.

9

I. Standards of Review

   A. Summary Judgment

   Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002). The applicable substantive law determines which facts are material and may affect the outcome of the appeal. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

   Once the moving party meets its initial burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted). At this stage, the Board's role is not "'to weigh the evidence and determine the truth of the matter,' but rather to ascertain whether material facts are disputed and whether there exists any genuine issue for trial." *Sonabend Co.*, ASBCA No. 63359, 24-1 BCA ¶ 38,482 at 187,033 (quoting *Holmes & Narver Constructors, Inc.*, ASBCA Nos. 52429, 52551, 02-1 BCA ¶ 31,849 at 157,393). A dispute is genuine if, based on the entirety of the record, a reasonable factfinder could resolve a factual matter in favor of the nonmovant. *Anderson*, 477 U.S. at 248. All evidence must be viewed in the light most favorable to the nonmoving party. *Crown Operations*, 289 F.3d at 1375.

   B. Sovereign Acts Defense

   In its motion, the Navy seeks summary judgment on its sovereign acts defense—"an affirmative defense that is an inherent part of every government contract." *Conner Bros. Constr. Co. v. Geren*, 550 F.3d 1368, 1371 (Fed. Cir. 2008) (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 988 F.2d 953, 958 (Fed. Cir. 1993)). Under this doctrine, the government in its role as contractor cannot be held liable for its general and public acts taken in its capacity as sovereign. *Id.*; *McCarthy HITT – Next NGA West JV*, ASBCA No. 63571 *et al.*, 24-1 BCA ¶ 38,483 at 187,041. The defense is rooted in the principle that "private contractors who deal with the United States should not be treated any more favorably than if they had contracted with a private party." *Conner Bros. Constr. Co.*, 550 F.3d at 1373 (citing *Horowitz v. United States*, 267 U.S. 458, 461 (1925)). "[T]he object of the sovereign acts defense is to place the Government as contractor on par with a private contractor in the same circumstances[.]" *United States v. Winstar Corp.*, 518 U.S. 839, 904 (1996).

   To prevail, the government bears the burden of showing that: (1) the governmental action was public and general; and (2) the act rendered performance of the contract impossible or impracticable. *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1366 (2009); *Conner Bros. Contr. Co.*, 550 F.3d at 1379; *McCarthy HITT*,

10

24-1 BCA ¶ 38,483 at 187,041.  Applying this standard, we conclude that the Navy's actions, taken in its sovereign capacity to respond to the COVID-19 pandemic, were public and general in nature and rendered both access to the AUTEC worksite and performance of the contract as originally planned impracticable.  Accordingly, the sovereign acts defense applies to preclude recovery for costs associated with onsite performance and the replanning effort.  However, we deny summary judgment as to preconstruction and personnel inefficiency costs, which were incurred offsite and for which the Navy has not established that performance was rendered impracticable by the government's sovereign actions.

II.  The Officer-in-Charge's order to close AUTEC to non-essential personnel was a sovereign act that rendered some aspects of performance impossible.

    A.  The sovereign acts doctrine bars recovery for costs associated with the onsite work.

The parties do not dispute that the government's decision to limit base access at AUTEC to mission-essential personnel in response to the COVID-19 pandemic was a public and general act.  In fact, Haskell expressly "concedes that the AUTEC Commander's . . . *initial* decision to close AUTEC effective March 20, 2020, to minimize the potential threat of the coronavirus may have been a sovereign act that applied to construction activities that would have had to physically happen on the AUTEC Base" (app. opp'n at 7 (internal quotations omitted); *id.* at 9 (describing the closure of AUTEC to non-essential personnel as "understandable and makes good sense"), 21-22 (acknowledging that "the Government's action to close AUTEC may have initially been categorized as a sovereign act"); *see also* compl. ¶¶ 74, 136 (stating that the Officer-in-Charge had "had probable cause to initially close the base during the first few weeks of the COVID-19 pandemic")).

In this regard, the AUTEC Officer-in-Charge, acting in a sovereign capacity, exercised his executive authority to protect public health by closing the base to all non-essential personnel (SOF ¶¶ 8-9).  There is no allegation that the closure was targeted at Haskell or motivated by any effort to gain a financial advantage under this contract—two important factors in *Conner Brothers*, 550 F.3d at 1374-75.  Thus, we conclude the closure of AUTEC was public and general in nature.  *Id.*, 550 F.3d at 1374-75; *J.E. Dunn Constr. Co.*, ASBCA No. 62936, 22-1 BCA ¶ 38,123 at 185,192; *APTIM Fed. Servs.*, ASBCA No. 62982, 22-1 BCA ¶ 38,127 at 185,219.

The parties also agree that these sovereign measures rendered onsite performance impossible (gov't mot. at 29; app. opp'n at 11 (acknowledging that Haskell was "denied access to the AUTEC Base by the Commander"), 7 (claiming that the government "prevent[ed] access to the site for 401 days"), 55 (stating "Appellant admits they were denied access to the Base by the Commander"), 2 (asserting that the

only inquiry for the Board to consider is whether offsite work was impossible, thereby conceding that onsite work was not possible); compl. ¶ 29 ("The Base commander closed AUTEC for an unreasonable amount of time, denying Haskell access to the PROJECT worksite.")).

As stated above, the task order here is a fixed-price contract, under which the contractor assumes "maximum risk and full responsibility for all costs and resulting profit or loss." FAR 16.202-1; *APTIM Fed. Servs.*, 22-1 BCA ¶ 38,127 at 185,219 (citing *Lakeshore Eng'g Servs. v. United States*, 748 F.3d 1341, 1347 (Fed. Cir. 2014)). We note that Haskell does not allege, nor does the record support, that the contract shifted the risk of increased costs resulting from the COVID-19 pandemic to the government. To the contrary, the task order included the provision titled "Anticipated Restricted Delays," which instructed the contractor to anticipate up to five lost workdays per year due to restricted site access (SOF ¶ 5). In the event of delays exceeding that threshold, the contract specified that the contracting officer would issue a no-cost modification (*id.*). In addition, the task order incorporated FAR 52.249-10 (SOF ¶ 2), which excuses delays caused by sovereign acts of the government, epidemics, and quarantine restrictions. FAR 52.249-10(b). While this clause may entitle a contractor to additional time for performance, it does not authorize additional compensation. *Id.*; *Phylway Constr., LLC*, ASBCA No. 62961, 22-1 BCA ¶ 38,218 at 185,620. Accordingly, the government's closure of AUTEC was a sovereign act that rendered onsite performance impossible, and the contract did not reallocate to the government the risk of increased costs arising from such sovereign actions.

B. The sovereign acts doctrine bars recovery for the costs of replanning construction under new conditions following AUTEC's reopening.

Similarly, Haskell's claim for costs incurred after the base reopening to replan the project under new conditions is, for the most part, barred by the sovereign acts doctrine. Our ability to assess the full extent of this bar is limited by Haskell's imprecise use of terms such as "new replanning effort," "new terms and conditions," and "new contract requirements" (*see e.g.*, app. opp'n at 58; R4, tab 20 at GOV1694-96, 1701, 1713). Based on our review of the record, we believe that the claimed impacts fall into four distinct categories. We address each in turn.

1. Replanning Costs Following the Year-Long Delay

The first category consists of costs incurred in replanning contract performance after a year-long delay in accessing the site (*see e.g.*, app. opp'n at 58; R4, tab 20 at GOV1701, GOV1714; app. supp. R4, tab 77 (Martin aff.) ¶¶ 68-69 ("Replanning activities addressed the changes in work conditions due to the delay from the base closure."), ¶ 76 ("The amounts in Haskell's Claim are for new activities that were

12

required due to the delay of contract performance."). These are not "new" requirements imposed by the government. Rather, they are the natural and foreseeable consequences of the government's sovereign acts that restricted access to the worksite. Haskell's fixed-price contract places the risk of such costs on the contractor. Accordingly, the Board grants summary judgment as to these replanning costs.

### 2. Compliance with Revised Base Access Policies

The second category concerns the costs of complying with new base access protocols implemented in response to the COVID-19 pandemic, such as bubble-to-bubble plans, quarantine requirements, or other ROM requirements (*see e.g.*, R4, tab 20 at GOV1692-93, GOV1701, GOV1715; Martin aff. ¶ 69). These types of base access restrictions, even if burdensome, reflect the exercise of sovereign authority to protect health and national security, and they do not give rise to an entitlement to additional compensation. The Board has repeatedly held that contractors may not recover additional compensation for costs stemming from such measures. *APTIM Fed. Servs.*, 22-1 BCA ¶ 38,127 at 185,217-18; *J.E. Dunn Constr. Co.*, 22-1 BCA ¶ 38,123 at 185,192; *M.E.S., Inc.*, ASBCA No. 56149 *et al.*, 12-1 BCA ¶ 34,958 at 171,856; *Garco Constr., Inc.*, ASBCA Nos. 57796, 57888, 14-1 BCA ¶ 35,512 at 174,073; *Troy Eagle Grp.*, ASBCA No. 56447, 13-1 BCA ¶ 35,258 at 173,061-62.

### 3. Logistical Bottleneck Costs

The third category includes costs Haskell attributes to coordination conflicts that allegedly occurred after AUTEC reopened, when multiple projects resumed concurrently. In its claim, Haskell asserts that the Navy's decision to restart all projects at once disrupted the previously staggered sequencing of construction contracts, resulting in a logistical bottleneck and inefficiencies. (R4, tab 20 at GOV1696-97, GOV1703, GOV1714) Neither party adequately addresses this category of costs, and the record is insufficiently developed for us to resolve it on summary judgment. Accordingly, the Board denies summary judgment as to claims for costs stemming for the alleged logistical inefficiencies.

### 4. Scope Changes or Design Modifications

Finally, one possible interpretation of "new" requirements could be that the Navy changed the scope of work—such as altering the design (Martin aff. ¶ 69). If such claims exist, our ruling here does not dispose of them. They are not addressed in the briefing and would need to be adjudicated on a separate evidentiary basis.

In short, with respect to the closure of the base and the subsequent replanning under new conditions, we conclude that the facts of this appeal closely mirror those addressed in our prior COVID-related decisions, *APTIM Fed. Servs.*, 22-1 BCA

¶ 38,127, and *J.E. Dunn Constr. Co.*, 22-1 BCA ¶ 38,123.  In each case, the Board found that base closure and access restrictions imposed in response to the pandemic were sovereign acts that precluded contractor recovery for associated costs.  The government-imposed limitations were public and general in nature, not targeted at any specific contractor, and rendered government performance impracticable given the overriding public health and operational constraints.  The same holds true here.

### C. The Board will not second-guess the sovereign's judgment on the duration of the base closure.

Although Haskell concedes that the Officer-in-Charge's initial decision to close AUTEC was a sovereign act, it argues that the duration of the closure was unreasonably long (app opp'n at 2, 7).  In support, Haskell alleges that other Navy bases resumed construction work much earlier (app. opp'n at 2, 9-11; compl. ¶¶ 76, 97; app. supp. R4, tabs 73-76)).  It contends that the extended closure of AUTEC was unreasonable, arbitrary, and capricious (*id.* at 11).

As an initial matter, Haskell's comparison to other Navy bases is unpersuasive.  It makes no effort to allege—let alone support with any evidence—that AUTEC was similarly situated during the pandemic to the other installations referenced (*see* app. opp'n at 2, 9-10; Martin aff. ¶¶ 71-74; R4, tab 20 at GOV1693 n.2, GOV1694; compl. ¶¶ 76, 97).  To the contrary, in its own claim, Haskell emphasizes AUTEC's remoteness and the "unique and special planning" associated with performing construction work on a secure, foreign-located range (R4, tab 20 at GOV1695).  The government's pandemic response necessarily varied across installations, depending on local health conditions, host-nation restrictions, mission sensitivity, and logistical realities.  Haskell has offered no evidence that the decision to keep AUTEC closed for an extended period was arbitrary in light of those circumstances.[5]

More fundamentally, we decline to second-guess the sovereign's discretionary judgment concerning base access during a global public health emergency.  It is well-established that decisions regarding access to military installations rest with the installation commander, not the contracting officer or this Board.  *See Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 893-94 (1961); *Targe Logistics Servs., Co.*, ASBCA No. 63282, 24-1 BCA ¶ 38,653 at 187,895 (citing *Sang Kash Co.*, ASBCA No. 60532, 19-T1 BCA ¶ 37,373 at 181,703); *Garco Constr.*, 14-1 BCA ¶ 35,512 at 174,073; *Gargoyles, Inc.*, ASBCA No. 57515, 13 BCA ¶ 35,330 at 173,415-16.  Courts and boards have consistently recognized that base commanders have broad authority to exclude individuals or contractors from military installations when necessary to maintain good order, discipline, or security, and that such decisions are not

---

[5] On this point, Haskell provides no affidavit or other evidence establishing a dispute of material fact.

subject to contract challenge unless there is a substantiated showing that the government acted to nullify contractual rights or gain an economic advantage. *Sang Kash Co.*, ASBCA No. 60532, 19-1 BCA ¶ 37,373 at 181,703 (citing *Conner Bros. Constr. Co.*, ASBCA No. 54109, 07-2 BCA ¶ 33,703 at 166,786, *aff'd*, 550 F.3d 1368 (Fed. Cir. 2008); *Emerald Town Grp. Logistic Servs.*, 17-1 BCA ¶ 36,709 at 178,753-54).

Here, Haskell has made no such showing.[6] Its claim that AUTEC remained closed longer than other Navy bases is legally immaterial, particularly given the base's unique operational and geopolitical circumstances. The Board declines to scrutinize the sovereign's exercise of discretion in responding to a public health crisis. Haskell's challenge to the duration of the closure therefore fails to undermine the Navy's sovereign acts defense.

Before turning to the costs that survive summary judgment, we address three additional arguments raised by Haskell, each of which seeks—either directly or indirectly—to challenge or circumscribe the Officer-in-Charge's sovereign authority to keep AUTEC closed. These arguments fare no better.

1. Alleged Lack of Probable Cause to Keep AUTEC Closed

Haskell asserts that the Officer-in-Charge lacked probable cause to maintain the closure of AUTEC because the Bahamian Government lifted its COVID-19 restrictions in June 2020 and informed AUTEC that it "may continue operations as normal" (app. opp'n at 2, 10, 28, 31 (citing app. supp. R4, tab 6.8)). Although there appears to be some factual dispute over the scope and effect of the Bahamian Government's communication (*compare id.* at 36, 41, *with* gov't reply at 25-26), we assume for purposes of this motion that Haskell's characterization is accurate. Even so, this assertion does not alter our analysis. The decision to keep AUTEC closed after June 2020 was made by the Officer-in-Charge in his sovereign capacity and falls squarely within his discretionary authority to safeguard mission readiness and public health. As discussed above, the Board does not second-guess the sovereign's judgment when exercising such discretion, particularly in the midst of an evolving global pandemic.

---

[6] In a footnote in its claim, Haskell briefly contends that other contractors had personnel onsite at AUTEC and were performing contracts during the closure (R4, tab 20 at GOV1693 n.2). In its opposition to the Navy's motion, however, Haskell fails to identify or submit any evidence that would establish a genuine dispute of material fact. Accordingly, the allegation provides no basis to deny summary judgment.

## 2.  Reasonableness of Government Protocols

Relatedly, Haskell argues that the government could have implemented less burdensome or more reasonable protocols (app. opp'n at 23, 31).  However, we have expressly rejected the notion that the validity of a sovereign act depends on whether the government could have chosen a less restrictive or more contractor-friendly alternative.  *Conner Bros. Constr. Co.*, ASBCA No. 54109, 07-2 BCA ¶ 33,703 at 166,880 (quoting *Klamath Irrigation Dist. v. United States*, 75 Fed. Cl. 677, 688 (2007)); *see also Walter Dawgie Ski Corp.*, 30 Fed. Cl. 115, 133 (1993).  The relevant inquiry is not whether the government's response was optimal, but whether it acted in its sovereign capacity to achieve a public and general objective.[7]

## 3.  Implied Duty of Good Faith and Fair Dealing

Finally, Haskell asserts that NAVFAC breached the implied duty of good faith and fair dealing by failing to request the Officer-in-Charge to reopen AUTEC, minimize the duration or extent of the base closure, or otherwise secure access to the site so that Haskell could continue construction (app. opp'n at 5-6).  In essence, Haskell argues that NAVFAC had an affirmative obligation to advocate on its behalf with the sovereign decisionmaker.  We reject this argument.

While every contract includes an implied duty of good faith and fair dealing, this duty does not operate to expand a party's contractual obligations beyond those expressly agreed upon.  *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014)).  Haskell does not direct our attention to any contractual provision requiring NAVFAC to intervene in sovereign decisions made by the Officer-in-Charge regarding base access.  Indeed, the sovereign acts doctrine rests, in part, on the recognition that the government wears two hats—contractor and sovereign—and cannot be held liable for failing to control sovereign acts that are beyond the scope of its contractual role.  NAVFAC had no contractual or legal authority to override or

---

[7] Haskell mischaracterizes our decision in *J.E. Dunn Constr. Co.*, 22-1 BCA ¶ 38,123 (app. opp'n at 33-34).  Contrary to Haskell's contentions, the Board did not "require[] [the government] to adopt the least restrictive quarantine protocols," nor did we "express[] [our] desire for the Government to use the least restrictive and least costly quarantine protocols" (*id.*).  Rather, the Board concluded that the issue was moot because appellant would have suffered the same damages under less restrictive protocols.  *J.E. Dunn Constr. Co.*, 22-1 BCA ¶ 38,123 at 185,192-93.

influence the base commander's sovereign judgment about when or how to reopen AUTEC.[8]

In sum, we conclude that the government's closure of AUTEC and related base access restrictions were sovereign acts that rendered certain aspects of performance impossible and do not give rise to contractor entitlement. As a final observation, Haskell's 60-page opposition brief was difficult to follow, marked by extensive repetition and disorganized presentation. For example, the same argument—that the government was required to adopt the least restrictive means—was repeated nearly verbatim at least a dozen times (app. opp'n at 23-24, 26-27, 31, 33-34, 36, 40-41, 44, 49). While we have not addressed every argument or citation individually, we have reviewed and considered all of them. To the extent not discussed, we conclude they do not provide a basis to deny the Navy's motion with respect to the costs associated with the base closure or replanning under new conditions.

III. Disputed facts preclude summary judgment on costs associated with offsite, preconstruction work that did not require base access.

We now turn to the remaining portions of Haskell's claim that are not barred by the sovereign acts doctrine. We deny the Navy's motion for summary judgment with respect to Haskell's claimed costs for offsite, preconstruction work, including the alleged "personnel inefficiency" costs. While the Navy contends that all claimed damages stem from the Officer-in-Charge's sovereign act of closing AUTEC (gov't mot. at 38), Haskell has raised genuine disputes of material fact as to whether certain offsite activities could have continued during the closure.

Haskell asserts that numerous preconstruction tasks—such as long-lead procurement, finalizing subcontracts, preparing submittals, and mobilizing materials for shipment—did not require physical access to AUTEC and could have proceeded safely during the base closure (app. opp'n at 2-4). These tasks, Haskell argues, were expressly required under the contract and not inherently site-dependent (*id.* at 2-3).

Despite requesting authorization to perform this offsite work, Haskell claims NAVFAC refused to issue a limited Notice to Proceed or partial work order (*id.* at 4, 30). According to Haskell, this refusal lacked a legal, contractual, or public health

---

[8] Haskell raises other allegations of breaches of the duty of good faith and fair dealing relating to NAVFAC's failure to issue a Notice to Proceed with offsite preconstruction work (app. opp'n at 5-6, 21). As explained in the subsequent section, we do not grant summary judgment with respect to these costs. Thus, we need not determine, at this time, whether the Navy has breached any alleged duty in this regard.

17

justification and constituted an unreasonable and compensable suspension of work that exacerbated the delay and prevented mitigation efforts (*id.* at 12-13, 33, 40).

Haskell supports its position with an affidavit from Haskell's Director of Project Development, Jerry Martin. Mr. Martin submitted a comprehensive, 77-paragraph affidavit that is fact-laden, well-supported with citations to the contemporaneous record, and compelling in its detail. Mr. Martin avers that preconstruction work continued despite the base closure and that NAVFAC was kept apprised of these efforts (Martin aff. ¶¶ 4, 12, 20). He explains that such work did not require access to AUTEC (*id.* ¶¶ 12, 16-17, 29, 39, 66). He further explains that NAVFAC's refusal to authorize certain offsite tasks and pay for work completed hindered efficient progress and increased project costs (*id.* ¶¶ 22, 40, 43-46, 50, 51-57, 66).

We conclude that Haskell has raised genuine disputes of material fact with respect to these costs. Without weighing the evidence, we cannot determine, on the record before us, which preconstruction tasks could have reasonably proceeded offsite; whether a Notice to Proceed was required to authorize those offsite preconstruction tasks; whether NAVFAC's refusal to authorize such tasks was justified; and whether the sovereign acts doctrine renders performance of those tasks impossible. As we have stated, the sovereign acts defense requires a showing of impossibility, and at this stage, the Navy has not met its burden to demonstrate that its sovereign actions precluded performance of contract obligations that did not depend on base access. These unresolved issues preclude summary judgment on Haskell's claim for offsite, preconstruction costs, to include the personnel inefficiency costs. *McCarthy HITT*, 24-1 BCA ¶ 38,483 at 187,042.

## CONCLUSION

For the reasons discussed above, we grant the Navy's motion for summary judgment in part and deny it in part. We conclude that the Officer-in-Charge's decision to close AUTEC in response to the COVID-19 pandemic was a sovereign act. Under well-settled law, the duration of that closure is not subject to challenge absent a substantiated showing that the decision was intended to nullify contractual rights or confer an economic advantage on the government. Haskell has raised no such allegations. Accordingly, the sovereign acts doctrine bars recovery for costs allegedly incurred due to the base closure, which includes most, but not all, costs associated with replanning the effort. The same conclusion applies to any costs arising from post-reopening access restrictions or other public health measures implemented in the sovereign's capacity.

We deny the Navy's motion with respect to Haskell's claim for costs associated with offsite preconstruction activities. The current record reflects that some of this work could have proceeded—and in some instances did proceed—without requiring

18

access to AUTEC. The Navy has not met its burden to establish that all offsite work was rendered impossible by the base closure. Factual development is required to determine which activities were feasible and whether the sovereign acts doctrine bars recovery for related costs. Summary judgment is therefore inappropriate on this aspect of the claim. Finally, we also deny summary judgment with respect to the logistical bottleneck costs because we find the briefing and record insufficiently developed for us to grant summary judgment.

Dated: October 1, 2025

ELIZABETH WITWER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 63332, 63586, Appeals of The Haskell Company, rendered in conformance with the Board's Charter.

Dated: October 1, 2025

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals